Otto **EISENSCHIML**, Plaintiff-Appellant,

v.

**FAWCETT PUBLICATIONS**, Inc., Defendant-Appellee.

No. 11830.

United States Court of Appeals Seventh Circuit.

July 17, 1957.

Rehearing Denied Aug. 12, 1957.

Elmer Gertz, Irwin S. Baskes, Chicago, Ill., for appellant.

Don H. Reuben, Frank A. Olson, Howard Ellis, Keith Masters, Chicago, Ill., (Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., of counsel), for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

DUFFY, Chief Judge.

The complaint herein alleges copyright infringement. Count I alleges defendant infringed plaintiff's copyrighted book "Why Was Lincoln Murdered?" (hereinafter sometimes referred to as "Why"). The second Count alleged the defendant infringed plaintiff's copyrighted book "In the Shadow of Lincoln's Death" (hereinafter sometimes referred to as "Shadow"). Plaintiff seeks an accounting for profits, damages and costs pursuant to the Copyright Act, 17 U.S.C.A. § 1 et seq.

The defendant, Fawcett Publications, Inc., publishes a magazine called "True". Plaintiff alleges defendant infringed his copyright by publishing in the February, 1953, issue of True, an article entitled "America's Greatest Unsolved Murder" written by one Joseph John Millard. The cause was referred to a Special Master, although the oral testimony of only five witnesses was heard by him. He also considered three depositions including that of Joseph Millard, and examined numerous exhibits.

The Special Master made a report recommending that the Court enter judgment for the defendant, and that the plaintiff be taxed all costs including the payment of an attorney fee. He reported that the parties had deposited with the Master the sum of three thousand dollars for fees, and he requested an additional allowance of three thousand dollars. Exceptions were filed to the report. The District Court filed a short memorandum, and entered an order overruling objections to the report, ordering the plaintiff to pay the Special Master an additional sum of Forty-five Hundred Dollars and to reimburse the defendant in the amount of Fifteen Hundred Dollars for the sum which it had deposited with the Special Master. The Court also ordered that the plaintiff pay attorney fees. The amounts allowed by the Court were Fifteen Hundred Dollars more than had been requested by the Special Master; however, the latter has filed a partial satisfaction to the extent of Fifteen Hundred Dollars.

Plaintiff has written a number of articles and books on the Civil War period. He is an acknowledged authority in the field of Civil War history and, in particular, in the narrower field of Lincoln's assassination. His research on this subject extended over a period of eighteen years, and plaintiff testified he expended $20,000.00 in doing this work. Millard testified no competent authority would write about Lincoln's assassination without studying plaintiff's works.[1] Millard read plaintiff's "Why" and "Shadow" at least twice before writing his article.

Joseph Millard has been a free lance author and writer for twenty-five years. He has penned and sold over one thousand stories to popular media. He has made a study of the Civil War period, and has accumulated a Civil War library containing many books, magazines and newspapers. At the time of his deposition he produced more than a hundred books from his library. Prior to writing the alleged infringing article he had written, and defendant had published, two earlier articles concerning the Civil War. The first was published by True in December, 1945, and was entitled "The Spy Who Saved the Union." The story concerned the exploits of one Felix Stidger, a counter-espionage agent who had exposed the dangerous Copperhead Society called "Knights of the Golden Circle." The second was published in the July, 1947 issue of True, and was called "The Devil's Errand Boy." This story concerned incidents in the life of Lafayette Baker who was head of the Secret Service during the Civil War, and who was a one-time intimate of Secretary of War, Edwin M. Stanton.

Plaintiff's book "Why Was Lincoln Murdered?" is a scholarly work, extensively documented and foot-noted. It is a hard-covered book of five hundred three pages divided into twenty-nine chapters. It concerns the assassination of Abraham Lincoln, and a subsequent history of the persons involved. The hypothesis of the work is that Secretary of War Stanton was implicated or at least had a guilty knowledge of the conspiracy. Twenty-two thousand copies of this work were sold.

Plaintiff's second book "In the Shadow of Lincoln's Death" is also a hard-covered book. It is four hundred fifteen pages in length and contains fourteen chapters. It is supplemented by extensive notations. One prominent reviewer described this book as a long foot-note to the earlier work "Why Was Lincoln Murdered?". Thirty-six hundred copies of this work were sold.

Defendant's article "America's Greatest Unsolved Murder" contains about twenty thousand words. It was the longest article and the main feature of the February, 1953 issue of True. The author originally entitled it "History's Maddest Murder Case." It contained no footnotes, bibliography or other documentation.

Neither defendant nor Millard ever asked or received permission to use material from plaintiff's books. Nowhere in the published article is Eisenschiml credited or referred to. The only such passage in the article as written by Millard was "Otto Eisenschiml, probably the world's leading authority on the mysteries of Lincoln's assassination, has in one curt sentence treated Stanton's diatribe to the respect which it deserves * * *." However, this passage was deleted from Millard's manuscript by defendant before publication in its magazine.

Two expert witnesses testified and, as so often happens, held diametrically opposed views. Dr. Donald Riddle is the head of the division of Social Sciences at the University of Illinois, Chicago Un-

[1]. In his article "The Devil's Errand Boy" Millard referred to plaintiff as follows: "Mr. Otto Eisenschiml of Chicago, the outstanding authority on Abraham Lincoln's death, has devoted a lifetime of intensive research to the subject. His two books—'Why was Lincoln Murdered' and 'In the Shadow of Lincoln's Death'—are packed with his own sensational discoveries. Yet he feels the surface has barely been scratched."

dergraduate Division at Navy Pier, and teaches American history. He has written books on Lincoln's Congressional career. He has done extensive work in studying and determining the textual history of the New Testament which included comparing the various Gospels' language to determine literary relationships. In Dr. Riddle's opinion, defendant's article is a literary copying of the Eisenschiml books here in question.

Dr. Ernest Samuels is a professor of English at Northwestern University. He has served as editorial adviser upon matters of style and scholarship for various publishers. He has written an historical biography "The Life of Henry Adams." One of his duties at the University has been to sit as a one-man court of review when students are accused of copying their English themes. He spent seventy-five to eighty hours analyzing the three works here under consideration. His opinion was that Millard's article was an independent literary creation.

Plaintiff insists Millard's article is a slavish imitation, paraphrase and copy of substantial portions of his two copyrighted books, and that defendant, through Millard, substantially appropriated his research. Eisenschiml claims that Millard's article contains substantially the same treatment of and language about Stanton, Lincoln, the Grants, John F. Parker, O'Beirne, Miss Harris and Major Rathbone, John Fletcher and Atzerodt as in the Eisenschiml books, and that said named persons are the principal characters in the Millard article as in the infringed portion of the Eisenschiml books. Plaintiff contends that Millard's article follows the same general outline or pattern as the plaintiff's two books, and that he treats the material therein in the same manner as does plaintiff.

Plaintiff insists Millard's article not only pirated the underlying theme of plaintiff's books,—the theme that Secretary of War Stanton may have been implicated in the assassination, that obstacles were deliberately placed in the way of Booth's capture, and that there are other unexplained mysteries—but the article treats the ideas, characters, scenes and events in the same way that plaintiff does. Plaintiff further states Millard's article so parallels and simulates plaintiff's two books that the article is actually a condensation of several chapters of *Why* with portions taken from *Shadow* plus some standard historical data.

Exhibit 7 received by the Master contained what plaintiff claimed were sixty-six parallels or quotes designed to show copying and paraphrasing by Millard of plaintiff's two books. The limitation of space will not permit more than a brief illustration of the quotes.

At page 56 of *Why* plaintiff wrote: "In his memoirs, Grant passed over this episode quickly and skillfully * * *." Millard, referring to the same matter, wrote "In his memoirs, Grant skillfully slid over the incident * * *."

At page 73 of *Why*, plaintiff wrote: "* * * L. A. Gobright, agent of the Associated Press at the Capitol * * was about to close his office * * * when he was informed of the tragedy. Rushing to the telegraph office, he sent a short special * * * he tore over to Ford's Theatre * * * and was fortunate enough to find Booth's derringer on the floor." Millard wrote: "One L. A. Gobright of the Associated Press was just closing his Washington Office when the terrible news came. Rushing out, he quickly wired his paper * * * From there, Gobright hurried to Ford's Theatre for more details. He was in the blood-spattered box when the man named Kent found the derringer on the floor."

In *Why* at page 120, plaintiff quoted from the O'Beirne diary. The O'Beirne papers were in plaintiff's exclusive possession. Millard quoted exactly the same passage. The comments following this quotation were as follows: Plaintiff said: "That close O'Beirne came to getting his man." Millard wrote: "That close O'Beirne came to making the capture then."

In *Shadow*, plaintiff wrote at page 55: "What can be the meaning of this? A dying man hears his name mentioned. He opens his eyes and acts surprised." Millard wrote: "Would a dying man be surprised at hearing his own name spoken?"

On page 71 of *Shadow*, plaintiff wrote: "(Baker) smiled, and said 'I intended to have his body, dead or alive, or a mighty good substitute for it'." Millard wrote: "* * * Baker, grinning harshly, would soon be remarking to a friend, 'I intended to have his body, dead or alive, or a mighty good substitute for it'."

In *Why*, at page 29, plaintiff refers to "The great scoop of the century * *." Millard refers to the same subject matter as "The newsbeat of the century * *."

On page 419 in *Why*, plaintiff wrote: "Mrs. Lincoln, frightened and distracted, had fallen to the floor in a faint. A sudden rage possessed Stanton. Brutally he gave orders to take 'that woman' out of the room and not to let her come back." Millard wrote: "When Mrs. Lincoln, half mad with grief and shock, fainted at the sight of her husband, Stanton waved his arms, bawling, 'Take that woman out of here. Get her out and don't let her come back!'"

Items in the career of the dissolute policeman, John Parker, who was Lincoln's bodyguard on the fatal night, were assembled by plaintiff from private papers of a Provost Marshal named O'Beirne, and from old and scattered records and archives of the Washington, D. C. police department. Millard could not have examined the O'Beirne files as they were in plaintiff's possession. It is admitted Millard did not examine the Washington police files.

The Parker story is an important part of Millard's article. When Carl Sandburg was writing "Abraham Lincoln, the War Years" he requested and received permission from plaintiff to incorporate the Parker story in his work. In his foreward in Volume I he wrote: "The liberal researches of Otto Eisenschiml on the closing scenes of Lincoln's life are a distinct contribution; * *"

Millard claims he received part of the Parker story from Sandburg's work. However, there are some parts used by Millard that were not used by Sandburg. The incident of the squawking ducks on the street car; the incident of Parker firing a pistol through a window of a house of ill fame; and the incident of Parker being severely kicked and injured by a man he was attempting to arrest, all of which were included in Millard's article, were not included in the Sandburg work. This information came from plaintiff's books because Millard did not examine the original police records, and they had appeared in no other book or article prior to that time.

In his testimony, Millard freely admitted that some of the material and ideas used by him in his article came from plaintiff's *Why* or *Shadow*. The following are illustrations of a number of his answers: "That, I believe, was queued to me by Dr. Eisenschiml's book"; "Oh, I got some of it from the Eisenschiml books"; "The thought was undeniably inspired by Dr. Eisenschiml"; "The idea, I think, is an inspiration of Dr. Eisenschiml"; "The idea, I think, I can positively state, was Dr. Eisenschiml's"; "The material, I think, came from Dr. Eisenschiml."

Millard's attention was called to a portion of his manuscript and he was asked to compare same with portions of plaintiff's *Why*. He testified: "It just shocks me a little. I did not get the language consciously from Dr. Eisenschiml, whether unconsciously I could not say. * * * It is not a copy, but there is a similarity there, and a rather shocking one to me."

It is apparent Millard did, to some extent, at least, use the material which resulted from plaintiff's research. In Toksvig v. Bruce Publishing Co., 7 Cir., 181 F.2d 664, 667, this Court said: "The question is not whether Hubbard could have obtained the same information by going to the same sources, but rather did

she go to the same sources and do her own independent research? In other words, the test is whether the one charged with the infringement has made an independent production, or made a substantial and unfair use of the complainant's work. Nutt v. National Institute, Inc., 2 Cir., 31 F.2d 236, 237."

But the Master and the District Court found that whatever use Millard may have made of plaintiff's work is not actionable "because it was an insignificant use, a fair use or use of non-copyrightable material." The Master and the Court also found the work of Millard "is an independent literary creation based upon independent research." The District Court said: "Not only Millard's sworn word, but all the circumstances, indicate clearly that he did not copy from the plaintiff."

Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A., provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." In Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 207 F.2d 912, at page 920 this Court said: "Findings of fact by a master are binding on the trial court unless clearly erroneous. * * * The threshold question here then is the same as it was in the court below,— whether, as a matter of law, the master's findings of fact were clearly erroneous. * * * Neither the trial court nor this one may refuse to recognize the findings 'merely because of a difference in personal persuasion * * * or a dissatisfaction with the result reached.'"

The Master found that Millard did not copy but that he worked independently. We agree that a large portion of Millard's article resulted from his independent work. But it also is apparent, as hereinbefore indicated, that a number of extracts from plaintiff's works were used in Millard's article. "* * * an infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy. Paraphrasing is copying and an infringement, if carried to a sufficient extent." 18 C.J.S. Copyright and Literary Property § 94, p. 217. This Court, quoting with approval from Ball on Law of Copyrights said in Toksvig v. Bruce Publishing Co., 181 F.2d 664, at page 667: "The question of infringement of copyright is not one of quantity but of quality and value."

■ Ideas, as such, are not protected by the law of copyright. Holmes v. Hurst, 174 U.S. 82, 19 S.Ct. 606, 43 L.Ed. 904; Kalem Co. v. Harper Brothers, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92. But the mode of expression used by the author can be protected. Dymow v. Bolton, 2 Cir., 11 F.2d 690. The association, arrangement and combination of ideas and thoughts and their form of expression may make a particular literary composition which is entitled to protection. Holmes v. Hurst, 174 U.S. 82, 19 S.Ct. 606, 43 L.Ed. 904; Chicago Record-Herald Co. v. Tribune Association, 7 Cir., 275 F. 797.

■ The question before us is did Millard make a substantial copy of plaintiff's books? Mazer v. Stein, 347 U.S. 201, 218, 74 S.Ct. 460, 98 L.Ed. 630. We must keep in mind that copying is not necessarily a literal or exact repetition or reproduction. The answer is not entirely free from doubt. However, we have concluded, in view of the findings of the Master, and the findings in the memorandum opinion of the District Court, that Millard did not substantially copy plaintiff's books,—in other words, we conclude that the findings of fact in this respect were clearly not erroneous.

Whatever we may think of the ethics of Millard in utilizing various portions of plaintiff's works with only a scant credit reference, or the ethics of the defendant in publishing the article after first eliminating the credit reference, we conclude, in view of the findings we must hold there was not a sufficient copying to amount to an infringement.

The Master found that such use as Millard did make of plaintiff's books was a fair use. If so such use was a non-infringing use. The question of a fair use usually arises in connection with scientific or other works dealing with a common subject matter. 18 C.J.S. Copyright and Literary Property § 104, p. 223. In historical writings such as the events immediately before and after President Lincoln's assassination, plaintiff and Millard were necessarily, writing about the same personages during a very limited period of time. It is to be expected that there would result some similarity of treatment. In any event, the issue of fair use is a question of fact. Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 85. We cannot say that the Master's finding in this respect is clearly erroneous.

We consider the award of attorney fees by the District Court to be an abuse of discretion and entirely unwarranted. True, the Master and the District Court were of the opinion that plaintiff's case was entirely without merit. However, we have indicated our view to the contrary. We have pointed out that a very close question was involved, and we hold that plaintiff should not be assessed attorney fees for trying to protect the copyright on his books. The provision in the judgment requiring plaintiff to pay attorney fees must be eliminated. Official Aviation Guide, Inc., v. American Aviation Associates, Inc., 7 Cir., 162 F.2d 541.

Criticism must also be made of the size of the record before the Master. In spite of repeated objections by plaintiff the time of the trial was unnecessarily prolonged.

Rule 16(c) of this Court, 28 U.S.C.A., provides: " * * * It is expected that the parties will not indulge in unnecessary or repetitious printing, having in mind the fact that the record is always available to the court for reference or examination. Infractions of this rule may be penalized by the denial or award of costs." Plaintiff's appendix contained 505 pages. Defendant filed a separate appendix containing 798 pages. Defendant's appendix contained much unnecessary and repetitious testimony. Defendant may include in its Bill of Costs the printing of only 400 pages of its separate appendix.

Modified as hereinbefore indicated, the judgment is

Affirmed.

SCHNACKENBERG, Circuit Judge (concurring in part, and dissenting in part).

I concur in Judge DUFFY'S opinion insofar as it disapproves the assessment of attorneys' fees against plaintiff.

Insofar as the opinion upholds the district court's finding and judgment on the merits of the case, I dissent. Even from those facts set forth in the majority opinion, it appears that the findings of the master and the district court are clearly erroneous. Rule 53(e) (2), Federal Rules of Civil Procedure. An examination of all the evidence in the record convinces me of Millard's transparent and shocking piracy of plaintiff's publications. For the wrongful and clearly established infringement, I would grant relief to this researcher and author.