**ROSEMONT ENTERPRISES, INC.,**
Plaintiff-Appellee,

v.

**RANDOM HOUSE, INC. and John Keats,**
Defendants-Appellants.

No. 473, Docket 30672.

United States Court of Appeals
Second Circuit.

Argued Aug. 1, 1966.

Decided Aug. 17, 1966.

Edward C. Wallace, New York City (Weil, Gotshal & Manges, Horace S. Manges and Marshall C. Berger, New York City, of counsel), for defendant-appellant, Random House, Inc.

Robert W. Maris, Philadelphia, Pa. (William T. Coleman, Jr., Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa.), for defendant-appellant, John Keats.

Jack Katz, New York City (Katz, Moselle & Schier, Chester C. Davis, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

MOORE, Circuit Judge.

On May 26, 1966, plaintiff-appellee, Rosemont Enterprises, Inc. (Rosemont) commenced this action in the district court alleging that copyrights which it owned on a series of articles entitled "The Howard Hughes Story" which appeared in Look Magazine in early 1954 were infringed by a book entitled "Howard Hughes—a Biography by John Keats" published on May 23, 1966 by defendant-appellant, Random House, Inc. In June, Rosemont made a motion for a preliminary injunction restraining the sale, publication, distribution and advertisement of the biography pending final determination of the action on the ground that it had made out a prima facie case of infringement. The defendants, Random House, Inc. and John Keats, opposed the motion on the grounds, *inter alia*, that the copying which was done was insubstantial and that, in any event, whatever use was made of the Look articles constituted a fair use and, thus, was privileged. The district court granted the motion for a preliminary injunction [1] and, in rejecting defendants' claim of fair use, narrowly confined the privilege to materials "used for purposes of criticism or comment or in scholarly works of scientific or educational value." In the district court's view, if a work is published "for commercial purposes" and is designed for the popular market, those responsible for its appearance are precluded from invoking the fair use privilege, regardless of the nature of the work involved. Since the court found that the Hughes biography "can scarcely be said to be a scholarly, scientific or educational work," and was designed for the popular market, it concluded that the fair use privilege was inappropriate here. For the reasons set forth below, we reverse.

The only issue presently before this court is: Was the preliminary injunction erroneously issued as a matter of law?

The articles entitled "The Howard Hughes Story" published in three issues

1. The district court denied a motion for reargument by defendants on July 13, 1966.

of Look Magazine dated February 9, 23 and March 9, 1954, and copyrighted by its publisher, Cowles Communications, Inc., in January and February 1954 and the allegedly offending book, published in 1966, "Howard Hughes—a Biography by John Keats," are before the court. The nature and extent of the infringement, if any, can be gauged by a comparison of the two writings. For the purposes of this appeal, an attempt will be made to restrict the factual statement to those undisputed items which bear upon a preliminary injunction.

*The Circumstances Under Which Plaintiff Acquired the Look Copyrights*

At the outset, defendants assert that plaintiff's conduct in acquiring the copyrights indicates that they were purchased solely for the purpose of bringing this lawsuit and, hence, plaintiff is deprived "of the right to relief as a matter of law and as a matter of equitable discretion."

From the facts as outlined in the district court's opinion, it appears that for some time prior to 1962 Random House had been considering a biography of Howard Hughes who by reason of his remarkable exploits and achievements, primarily in the aviation and motion picture fields, had become quite a public figure despite a publicized passion for personal anonymity. To prepare such a biography, Random House in September of 1962 engaged the services of Thomas Thompson, a member of the staff of Life Magazine. After submitting his draft manuscript, Thompson for business reasons could not continue with the additional work necessary for its completion. In the latter part of 1964, Random House obtained the services of an author, the defendant, John Keats, who took the Thompson manuscript, news and copyrighted magazine articles, including the 1954 Look articles, and various public documents, and produced the biography now before the court.

Apparently Hughes and/or his attorneys learned of the forthcoming Random House publication, and his attorney warned Random House that Hughes was opposed to the biography "and would make trouble if the book was published." The legal effect of the "trouble" should not be pre-judged at this time, except as certain aspects bear upon the granting of the preliminary injunction. Whether there be any reality to the claim that the plaintiff Rosemont, organized in September 1965 by Hughes' attorney and two officers of his wholly-owned Hughes Tool Company, is engaged in writing a Hughes biography, must await the trial. For the present, it is sufficient to note that in February 1966 plaintiff, having by some means obtained a galley proof of the forthcoming biography, brought an action against defendants in the Supreme Court of New York alleging in substance a plan to exploit commercially the name and personality of Hughes and an invasion of his right of privacy.

On May 20, 1966, plaintiff obtained from Cowles Communications, Inc. (Look), the copyrights to the 1954 Look articles, so advised Random House the next day and brought this suit five days later. Apparently Look had done nothing with the articles since 1954; they had not been compiled into book form or reprinted or offered to the public in any manner except as articles in three February and March 1954 editions of Look. Nor is there any indication that Look, although advised of the proposed Random House biography, intended to bring an infringement action or to seek an injunction. However, whether the "trouble" threatened will have legal consequences sufficient to constitute a defense cannot be determined upon the facts as adduced at this stage. Nevertheless, we have referred with approval to the rule that " 'The interference of the court by injunction being founded on pure equitable principles, a man who comes to the court must be able to show that his own conduct in the transaction has been consistent with equity.' " T. B. Harms & Francis, Day & Hunter v. Stern, 231 F. 645, 649 (2 Cir., 1916).

*A Comparison of the 1954 Look Articles and the 1966 Biography*

The three 1954 Look articles contain some 13,500 words and would have,

if published in book form (which they were not), filled some 36 to 39 book-size pages. The 1966 biography consists of some 116,000 words and 304 pages. The Look articles do not purport to be a biography in the accepted meaning of the word but narrate certain phases or highlights of Hughes' quite eventful career. Naturally, any writing purporting to deal with the life of a public figure is bound to touch upon the same events as have given rise to the publicity. In addition, various incidents of interest to the reading public can usually be developed from friends, neighbors, teachers, business associates, employees, newspaper and magazine articles and public and private records. And so here the biography gives evidence of such source material. Moreover, there can be little doubt that portions of the Look articles were copied. Two direct quotations and one eight-line paraphrase are attributed to Stephen White, the author of the articles. A mere reading of the Look articles, however, indicates that there is considerable doubt as to whether the copied and paraphrased matter constitutes a material and substantial portion of those articles. On the other hand, the material at most forms an insubstantial part of the 304-page biography. Furthermore, while the mode of expression employed by White is entitled to copyright protection, he could not acquire by copyright a monopoly in the narration of historical events. Finally, in an affidavit submitted to the district court, Thompson asserted that he engaged in extensive research while preparing his manuscript, which included personal interviews with many people familiar with Hughes' activities (fifteen of whom he listed by name)[2] and the employment of a Houston newspaper man to conduct additional interviews for him. There is no dispute that defendant Keats,

named as author of the biography, was retained solely to revise Thompson's manuscript which, as described in his contract with Random House, was to include rewriting and reorganization; rechecking facts against the sources used; and such additional research as was necessary to "update the work and fill in facts and events."[3] In any event, the extent of Keats' independent research is of little relevance since Thompson's work, embodied in the manuscript, formed the core of the published biography.

■ While it is undoubtedly true, as the district court observed, that "the book does rely heavily on previously published newspaper and magazine articles and similar material," that fact does not create a presumption of infringement. At this time, we are not prepared to hold that as a matter of law there has been a clear showing of probable success at a trial with respect to the extent and quality of infringement of the Look articles which warrants the grant of a preliminary injunction.

*Fair Use*

There is no question that material appearing in the Look articles is contained in the Hughes biography. Appellants contend, however, that the district court erred as a matter of law in refusing to honor their claim of fair use on the ground that the court unjustifiably restricted the privilege to scholarly works written and prepared for scholarly audiences. We agree.

■■ "Fair use" is a "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner * * *" Ball, Copyright and Literary Property 260 (1944). See generally Latman, Fair Use of Copyrighted

---

**2.** While Rosemont submitted statements from two persons listed by Thompson stating that they were not interviewed by him, this merely raises an issue of fact for determination at a trial on the merits.

**3.** Keats' own evaluation of the manuscript was that the greatest difficulty concerned

accuracy and that various areas discussed had to be rechecked. He felt that only some areas in the manuscript required new research, particularly the area of corporate finance.

The present record contains no affidavit from Keats as he was unavailable when the instant motion was made.

Works, Study No. 14, prepared for the Subcommittee on Patents, Trademarks and Copyrights, Senate Comm. on the Judiciary, 86th Cong., 2d Sess. (Comm. Print 1960). The fundamental justification for the privilege lies in the constitutional purpose in granting copyright protection in the first instance, to wit, "To Promote the Progress of Science and the Useful Arts." U. S. Const. art. 1, § 8. See Mathews Conveyor Co. v. Palmer-Bee Co., 135 F.2d 73 (6th Cir. 1943); Note, 56 Colum.L.Rev. 585, 595 (1956). To serve that purpose, "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry." Berlin v. E. C. Publications Inc., 329 F.2d 541, 544 (2d Cir. 1964). Whether the privilege may justifiably be applied to particular materials turns initially on the nature of the materials, e. g., whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter. Consequently, the privilege has been applied to works in the fields of science, law, medicine, history and biography. See Latman, supra at 10.

■ Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. Cf. Harris v. Miller, 50 U.S.P.Q. 306, 309 (S.D.N.Y.1941). This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e. g., so "that the world may not be deprived

of improvements, or the progress of the arts be retarded." Sayre v. Moore, 1 East. 361, 102 Eng.Rep. 138, 139 (K.B. 1801); see West Publishing Co. v. Edward Thompson Co., 169 F. 833, 837 (E.D.N.Y.1909).[4] Indeed, while the Hughes biography may not be a profound work, it may well provide valuable source material for future biographers (if any) of Hughes or for historians or social scientists. Contrary to the district court's view, the arts and sciences should be defined in their broadest terms, see Sampson & Murdock Co. v. Seaver-Radford Co., 140 F. 539, 541 (1st Cir. 1905), particularly in view of the development of the field of social sciences.

(a) *Commercial Gain*

■ Whether an author or publisher reaps economic benefits from the sale of a biographical work, or whether its publication is motivated in part by a desire for commercial gain, or whether it is designed for the popular market, i. e., the average citizen rather than the college professor, has no bearing on whether a public benefit may be derived from such a work. Moreover, the district court in emphasizing the commercial aspects of the Hughes biography failed to recognize that "[a]ll publications presumably are operated for profit * * *." Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, 483, 68 N.Y.S.2d 779, 783, aff'd, 272 App.Div. 759, 69 N.Y.S.2d 432 (1st Dept. 1947), and that "both commercial and artistic elements are involved in almost every [work] * * *" Note, 56 Colum.L.Rev. supra at 597. Thus, we conclude that whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use. Cf. Koussevitzky v. Al-

4. As one noted authority has stated, "The world goes ahead because each of us builds on the work of our predecessors. 'A dwarf standing on the shoulders of a giant can see farther than the giant himself.' Progress would be stifled if an author had a complete monopoly on everything in his book * * *" Chafee,

Reflections on the Law of Copyright, 45 Colum.L.Rev. 503, 511 (1945). See, for example, the extensive sources listed by Albert J. Beveridge in The Life of John Marshall (4 vols.) (1919) and Eugene C. Gerhart in America's Advocate: Robert H. Jackson (1958).

len, Towne & Heath, 68 N.Y.S.2d supra, 782–784 (construing N. Y. Civil Rights Law, McKinney's Consol.Laws, c. 6, § 51).[5] This conclusion is consistent with the position taken by this court in Berlin v. E. C. Publications, Inc., supra. There the holders of copyrights on various popular songs claimed that the publishers of "Mad" Magazine infringed the copyrights by placing parodies of the songs in their popular magazine. The plaintiffs broadly maintained that copying for commercial gain may never be fair use. This court rejected that position on the ground that it failed to "recognize parody and burlesque as independent forms of creative effort * * * worthy of judicial protection in the public interest." Id. 329 F.2d at 543. Similarly, the district court by maintaining that a biography that is designed for commercial success falls outside the protection of the fair use doctrine did not give adequate recognition to such works. Cf. Estate of Hemingway v. Random House, Inc., 49 Misc.2d 726, 728, 268 N.Y.S.2d 531, 535, aff'd without opinion, 25 A.D.2d 719, 269 N.Y.S.2d 366 (1966). Biographical works, since their earliest beginnings in the Dialogues of Plato and Symposium of Xenophon relating the activities of Socrates, have been of perennial interest [6] not only because they deal with well-known persons but because their subject matter is human nature and they reflect the social, economic and political forces of the particular era involved. See generally 3 Encyc. Britannica 593C–598 (1959).[7]

The fair use privilege has been applied without question to other publications which have obviously been motivated in part by a desire for economic gain. See Holdredge v. Knight Publishing Corp., 214 F.Supp. 921 (S.D.Cal.1963) (article in popular magazine); Eisenschiml v. Fawcett Publications, 246 F.2d 598 (7th Cir. 1957) (article in popular magazine); Toksvig v. Bruce Publishing Co., 181 F.2d 664 (7th Cir. 1950) (popular biographical novel); Huie v. National Broadcasting Co., 184 F.Supp. 198 (S.D. N.Y.1960) (commercial television program); Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688 (2d Cir. 1938) (history study outline).

The district court relied heavily on Loew's, Inc. v. Columbia Broadcasting System, Inc., 131 F.Supp. 165, 174–176 (S.D.Cal.1955), aff'd, Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir. 1956), aff'd without opinion by an equally divided court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed. 2d 583 (1958) to support its restrictive view of the fair use privilege. That case involved a claim of copyright infringement against Jack Benny for his television parody of the motion picture "Gaslight." The district court in finding an infringement insisted on distinguishing television parody from more scholarly endeavors, emphasizing its commercial nature. Clearly that portion of the court's opinion is inconsistent with our decision in Berlin v. E. C. Publications, Inc., supra. Moreover, the Ninth Circuit in affirming the district court did not mention "commercial purpose." Its decision rested solely on the conclusion that the television parody constituted a wholesale appropriation of the motion picture and thus was unlawful. 239 F.2d at 536.

5. N.Y.Civil Rights Law § 51 proscribes the use of a person's name, portrait or picture "for advertising purposes or for the purposes of trade * * *." The New York Courts have held that biographical works do not fall within the terms of the statute, emphasizing the necessity for avoiding the restriction of free speech. See Koussevitzky v. Allen, Towne & Heath, supra; cf. New York Times v. Sullivan, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). They view the nature of the work, i. e., whether it is in the public interest, rather than possible profit motives as controlling. See Estate of Hemingway v. Random House, Inc., 268 N.Y.S.2d supra at 535.

6. Biography has been a well established form in the United States since the first quarter of the nineteenth century. See generally, Edward H. O'Neill, A History of American Biography 1800–1935 (1935).

7. Ralph Waldo Emerson once observed that "There is properly no history; only Biography." Essays First Series (1841), History.

Finally, it is clear that Henry Holt & Co., etc. v. Liggett & Myers Tobacco Co., 23 F.Supp. 302 (E.D.Pa.1938) does not support the district court's position. There the court held that a tobacco company's use of three lines from a doctor's medical treatise in its advertising pamphlet did not constitute a fair use of the copyrighted material. The court's decision did not rest, however, on the fact that profit might result from the use of the medical information. Rather, the nature of the allegedly infringing work was deemed controlling, to wit, it was an advertisement with a purely commercial purpose which under no circumstances could be considered a work designed "for the advancement of * * * science or art." Id. at 304.[8] Cf. Conde Nast Publications v. Vogue School of Fashion Modelling, 105 F.Supp. 325 (S.D.N.Y.1952). See also College Entrance Book Co. v. Amsco Book Co., 119 F.2d 874 (2d Cir. 1941).

### (b) The Public Interest

By this preliminary injunction, the public is being deprived of an opportunity to become acquainted with the life of a person endowed with extraordinary talents who, by exercising these talents, made substantial contributions in the fields to which he chose to devote his unique abilities. Inheriting a small fortune in early youth, Hughes can hardly qualify as a Horatio Alger hero in a "From Rags to Riches" story but a narration of his initiative, ingenuity, determination and tireless work to achieve his conception of perfection in whatever he did ought to be available to a reading public which, even in an affluent society, might well be reminded that affluence usually comes from the work of such entrepreneurs in business and industry.

██ The Keats biography is laudatory and where critical is critical in an understanding fashion.[9] Judging by the accounts in the Look articles and the biography, Hughes has almost an obsession as to his privacy and his right thereto. However, when one enters the public arena to the extent that he has, the right of privacy must be tempered by a countervailing privilege that the public have some information concerning important public figures. Cf. Sidis v. F-R Pub. Corp., 113 F.2d 806, 809–810 (2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940); Estate of Hemingway v. Random House, 268 N.Y.S.2d supra, at 535; Koussevitzky v. Allen, Towne & Heath, 68 N.Y.S.2d supra, at 782–784. The district court itself recognized that "Howard Hughes is a rather enigmatic contemporary personality of considerable public interest."

"Everyone will agree that at some point the public interest in obtaining information becomes dominant over the individual's desire for privacy." Sidis v. F-R Pub. Corp., supra, 113 F.2d at 809. Hughes has long been a newsworthy personality. Any biography of Hughes, of necessity, must recite the events of his life because biography in itself is largely a compilation of the past. Thus, in balancing the equities at this time in our opinion the public interest should prevail over the possible damage to the copyright owner.

### (c) Independent Research

One other aspect of the district court's decision bears discussion. While recognizing that "historical fact and events in themselves are in the public domain and are not entitled to copyright protection * * *," Lake v. Columbia Broadcasting System, Inc., 140 F.Supp. 707, 708–709 (S.D.Cal.1956); see Collins v. Metro-Goldwyn Pictures Corp., 106 F.2d 83, 86 (2d Cir. 1939), and that "a writer may be guided by earlier copyrighted works * * *," Benny v. Loew's, Inc.,

8. The statement by former United States District Judge Leon R. Yankwich that where the appropriation of copyrighted material "is motivated by the desire to derive commercial benefit, the use * * * is unfair." Yankwich, What Is Fair Use, 22 U.Chi.L.Rev. 203, 209 (1954), referred to by the court in Loew's Inc. v.

Columbia Broadcasting System, Inc., supra, was based solely on Henry Holt & Co., etc. v. Liggett & Myers Tobacco Co., supra, and constitutes an overly broad interpretation of that decision.

9. No claim has been made that the biography contains misrepresentations of fact.

239 F.2d supra, at 536; see Oxford Book Co. v. College Entrance Book Co., 98 F. 2d 688, 691 (2d Cir. 1938), the court asserted in sweeping language that an author is not entitled to utilize the fruits of another's labor in lieu of independent research and relying on Toksvig v. Bruce Publishing Co., 181 F.2d 664 (7th Cir. 1950), stated that such activity could not be considered a fair use. Moreover, the court assigned the "apparent lack of independent research" as an additional reason for refusing to honor defendant's fair use claim. With this conclusion we disagree as a matter of law.

■ In Toksvig v. Bruce Publishing Co., supra, the Seventh Circuit affirmed the grant of an injunction, in favor of an author who had written a careful biography of Hans Christian Andersen based on exhaustive research into Danish sources, against the publication of a subsequent biography of Andersen by an author who due to his inability to speak or read Danish had not independently examined the Danish sources and who had copied twenty-four specific passages of the first author's book. While the decision can be considered to rest on the ground that substantial and material copying was demonstrated, see Nimmer, Copyright at 133n. 576 (1964), the court went on to say that the use of plaintiff's book was not a fair use for the reason that reliance on the English translations of the Danish sources enabled the defendant to complete her book in much less time than it took plaintiff. Id. at 667. We, however, cannot subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material. Cf. Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688 (2d Cir. 1938). It is just such wasted effort that the proscription against the copyright of ideas and facts, and to a lesser extent the privilege of fair use, are designed to prevent. See Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv.L.Rev. 1569, 1584 (1963) (criticizing Toksvig v. Bruce Publishing Co., supra).

■ Our decision in Orgel v. Clark Boardman Co., 301 F.2d 119 (2d Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962), does not require a contrary result. There this court affirmed a finding of infringement where the author of a law book on eminent domain "lifted" the essence of a prior treatise on the same subject and adopted as his own the prior author's "analysis, organization of material, phrasing and citations * * *." Id. at 120. In that context the court remarked that one cannot appropriate the "fruits of another's labor and skill in order to publish a rival work * * *," ibid., citing West Publishing Co. v. Edward Thompson Co., 176 F. 833 (2d Cir. 1910). In *West Publishing Co.,* supra, this court merely pointed out that extensive copying of lists of judicial decisions or of headnotes in digests of cases contained in one published report of cases and legal digests by another publisher of similar material cannot be considered a fair use of the material whether or not it enabled one publisher to save time and effort. Id. at 838. The point simply is that "[t]he second historian or second directory publisher cannot bodily appropriate the research of his predecessor." Huie v. National Broadcasting Co., 184 F.Supp. 198, 200 (S.D.N.Y.1960). The fair use privilege is based on the concept of reasonableness and extensive verbatim copying or paraphrasing of material set down by another cannot satisfy that standard. See Holdredge v. Knight Publishing Corp., 214 F.Supp. 921, 924 (S.D.Cal. 1963); see Benny v. Loew's Inc., 239 F. 2d supra, at 536. See also MacDonald v. DuMaurier, 144 F.2d 696, 701 (2d Cir. 1944).

■ Lastly, in deciding whether a preliminary injunction should be granted, the possibilities of injury present and potential to the respective parties must be considered and weighed. There is no suggestion that the Look articles are in current publication or ever have been since their single appearance in 1954. There is no claim that any royalties are being received from the Look articles or

that any revenue is being derived therefrom. The Look articles and the biography are not in competition with each other. Moreover, one can only speculate at this time as to when, if ever, Rosemont will produce Hughes' authorized biography. In sum, there has been no showing that the biography has lessened the value of the articles copyrighted by Cowles. See Life Music, Inc. v. Wonderland Music Co., 241 F.Supp. 653 (S.D. N.Y. 1965).

Compelling reasons for not granting a preliminary injunction in a case such as this have recently been stated by the New York courts. In Pocket Books, Inc. v. Dell Publishing, 49 Misc.2d 252, 256, 267 N.Y.S.2d 269, 273 (1966), involving the title, "The Girl from 'Peyton Place,'" of a biography of Grace Metalious, the Court said:

> "A preliminary injunction is a drastic remedy, and the Court's reluctance to so intervene and condemn in this manner and at this stage of the action is heightened by the realization that we are here dealing with a book and not with an ordinary subject of commerce."

In Estate of Hemingway v. Random House, supra, where the plaintiff, the widow of Ernest Hemingway, sought to enjoin the then forthcoming publication of a biographical study of Hemingway, the Court stated at 268 N.Y.S.2d 534:

> "A preliminary injunction is always a drastic remedy and the one seeking to invoke such stringent relief is obliged to establish a clear and compelling legal right thereto based upon undisputed facts. The normal reluctance to impose a summary restraint in advance of a full and complete trial is particularly acute in a case such as this which deals with the publication of a book. Before the court will intrude into an area fraught with sensitivity in its possible impingement upon fundamental democratic and intellectual institutions, it will require a showing by the movant of a right, both legal and factual, in most unequivocal terms."

Furthermore, if upon the trial infringement to any extent were to be established, there seems to be no dispute that Random House would be able to respond to such damages as might be found.

The order granting a preliminary injunction is reversed and the injunction is vacated.

LUMBARD, Chief Judge, concurring, with whom HAYS, Circuit Judge, also concurs:

The district court should have denied any preliminary injunction to this plaintiff as there was good reason to believe that it was the instrument of Howard Hughes, created principally for the purpose of suppressing the biography of Hughes which Random House had published. We cannot approve an injunction under such circumstances as the plaintiff does not come here with clean hands. It has never been the purpose of the copyright laws to restrict the dissemination of information about persons in the public eye even though those concerned may not welcome the resulting publicity. It is the purpose of those laws to give reasonable protection to the product of an author and his manner of expression where the author's proper interest in the product might suffer thereby. It would be contrary to the public interest to permit any man to buy up the copyright to anything written about himself and to use his copyright ownership to restrain others from publishing biographical material concerning him.

The spirit of the First Amendment applies to the copyright laws at least to the extent that the courts should not tolerate any attempted interference with the public's right to be informed regarding matters of general interest when anyone seeks to use the copyright statute which was designed to protect interests of quite a different nature.

Such undisputed facts as were before the district court seem to me to point to the existence of a scheme developed by Hughes and his attorneys and em-

ployees to prevent the publication of any biography of Hughes and, in particular, the Random House biography.

By June 1965, Hughes had learned that Random House intended to publish a full length biography about his life. Through Gregson Bautzer, his California lawyer, Hughes told Bennett Cerf, Random House's chief executive, that he opposed its publication. He further informed Mr. Cerf that if Random House did not decide against its publication, Hughes, by means of his great resources could and would cause endless trouble.

Rosemont claims that on July 2, 1965 Hughes entered into an agreement with it whereby he gave to Rosemont the sole and exclusive right to publish his life story.[1] In any event, on September 16, 1965, Rosemont was incorporated, listing as its sole shareholders, a retired Hughes Tool Co. executive, a present Hughes Tool Co. executive, and Chester Davis, Hughes' New York lawyer. There is ample factual basis in the record to demonstrate that Rosemont was dominated by Hughes himself: employees of his wholly owned Hughes Productions open Rosemont's important mail, answer its telephone, and perform clerical and computer work for Rosemont, all without charge. In addition, Rosemont's part-time research man has testified that he takes his orders from a Hughes Tool Co. executive.

On September 29, Chester Davis contacted Mr. Cerf and informed him of the Hughes-Rosemont agreement. This was at Bautzer's suggestion. Thereafter, on February 17, 1966, Rosemont instituted a suit against Random House in the New York State courts, claiming a violation of its exclusive right to publish a Hughes biography. Despite the apparent frivolous nature of the claim, extensive discovery proceedings followed in which Random House opened its files to Rosemont. At about the same time, Bautzer

again called upon Mr. Cerf and told him that Hughes would make it "financially worthwhile" to Random House and the author to discontinue the biography. In addition, notwithstanding the Hughes agreement with Rosemont, he offered Hughes' cooperation in the publication of an "authorized" biography by Random House. When Cerf asked what assurances could be given, he stated that Hughes would be willing to pay a penalty if such cooperation were not forthcoming.

During March 1966, a dozen advance galley proofs of the biography were sent by Random House to leading magazines and newspapers for review purposes. Rosemont acquired a copy through unknown channels. Thereafter, Rosemont commenced negotiations with Cowles Communications, Inc., the publisher of Look Magazine, to obtain the copyright to the 1954 Look magazine articles.

Affidavits by Gardner Cowles, the chief executive of Cowles Communications, and by an executive vice-president of Cowles state: (1) that the assignment was requested only after Cowles failed to indicate whether it would take copyright action against Random House; (2) that such assignment was requested in order that the copyrights might be used in negotiation with Random House to prevent further distribution of the book,[2] and (3) that the copyrights could not be assigned to Hughes, they were told, since that might force Hughes to appear at a deposition. The affidavits further state that Hughes' lawyers admitted during the negotiation that Rosemont was merely a Hughes-controlled company and that Hughes was very upset about Random House's intended publication.

On May 20, 1966, Cowles and Rosemont entered into an agreement; Cowles assigned the copyrights in return for obtaining a right of first refusal on a serialization of Rosemont's Hughes biog-

---

1. There would seem to be some question as to exactly when this agreement was entered into as it was not acknowledged until September 27, 1965.

2. True Magazine in April 1966 printed a condensed version of the Random House biography. Cowles took no action against this publication.

raphy, if and when it is ready for publication. The agreement continued, showing Hughes' interest in the copyright as it was recognized by the parties to the agreement:

"We [Rosemont] agree that with reference to the assignment of copyrights or material given us by you we will not assign such copyrights to any person, firm or corporation other than Howard Hughes, or any corporation owned or controlled by him, or to our stockholders, provided Howard Hughes consents thereto."

Six days later, on May 26, 1966, Rosemont commenced this action in the district court.

Nor were Rosemont's efforts to stop publication of material about Hughes confined to Random House. During this same period, Lyle Stuart, Inc., a New York publisher, commissioned author Ezra Goodman to write a Hughes biography. Following this, on November 22, 1965, Goodman then entered into two agreements with Rosemont. First, Goodman agreed not to submit any material to his publisher unless it was first cleared with Rosemont. Under this contract Goodman's lawyer received $4,250. In a second agreement of the same date, Rosemont agreed to pay Goodman $38,250 purportedly for Goodman's unpublished manuscript of the life of D. W. Griffith. Rosemont thereafter rejected the manuscript on Hughes.[3] Thus nothing came of Lyle Stuart's attempts to publish a biography of Hughes.[4]

The implications from all the above facts are obvious. Hughes wanted nothing written about himself, the publication of which he could not control. The Rosemont Corporation was created to this end. The purchase of the Look copyright was a part of Hughes' plan to prevent the publication of a biography.[5] It is inherent in the nature of a man's biography that the major events in his life must be treated, and some similarity with prior works is thus inevitable. As such, a claim of infringement may often be a colorable one.

Here, Rosemont Enterprises acquired the Look copyright and sued upon it six days later asking injunctive relief, not with a desire to protect the value of the original writing but to suppress the Random House biography because Hughes wished to prevent its publication.

The plaintiff's conduct in this transaction was not consistent with the equity it seeks; it came into court with unclean hands. This, of itself, was sufficient reason why the district court should not have granted the preliminary injunction.

Of course I agree with the other reasons set forth in Judge Moore's opinion to support the conclusion that the district court should not have restrained the publication of the biography.

---

3. It was agreed by Goodman and Rosemont that any disputes arising from the contract would be submitted to binding arbitration by Perry Lieber, a public relations man for Howard Hughes and the Hughes Tool Company. He also found the manuscript unpublishable.

4. Sometime after the Rosemont-Goodman arrangements, Lyle Stuart, Inc. commenced an action in Supreme Court, New York County against Rosemont Enterprises, Howard Hughes, Gregson Bautzer, Chester C. Davis and Perry Lieber.

5. Rosemont Enterprises, Inc. has subsequently acquired the copyright to *The Howard Hughes Story* by Adela Rogers St. Johns, an article which appeared in the American Weekly Magazine dated April 13, 1947.