**Jay Robert NASH, Plaintiff,**

v.

**CBS, INC., MCA Television, Universal City Studios, William Whitehead, Harry Butler, Logan Clarke, Bill Dial, Richard Chapman, George Geiger, and Michael Piller, Defendants.**

**No. 86 C 0511.**

United States District Court, N.D. Illinois, E.D.

July 25, 1988.

Martin S. Agran, Agran & Agran, Ltd., Chicago, Ill., Harvey C. Gordon, Glenview, Ill., E. Leonard Rubin, William Brinks Olds Hofer Gilson & Lione, Ltd., Chicago, Ill., for plaintiff.

William G. Schopf, Jr., Schopf & Weiss, Chicago, Ill., for defendants.

### MEMORANDUM OPINION

GRADY, Chief Judge.

This copyright infringement case comes before us on the parties' cross-motions for summary judgment on the issue of whether plaintiff Jay Robert Nash ("Nash") has alleged infringement of "copyrightable" material. We deny the defendants' motion and grant the plaintiff's.

FACTS

Nash has written several copyrighted books in which he claims that John Dillinger, the notorious bank robber, was not shot outside Chicago's Biograph Theatre on July 22, 1934. According to Nash, on that hot summer night in 1934, FBI agents mistak-

enly shot and killed a small-time hoodlum named Jimmy Lawrence. *See* J. Nash, *Dillinger Dossier*, at 79–110. In his books, Nash constructs an elaborate theory to show that the man killed at the Biograph was not Dillinger; that Dillinger and other criminals (including the famous "lady in red" who supposedly betrayed him) set up the unfortunate Lawrence; that, fearing embarrassment, the FBI covered up its killing of the wrong man; and that, soon after the incident, Dillinger moved to the West Coast, where he lived peacefully until at least 1979. *Id.* at 171–81, 205–30. As evidence for his explanation, Nash points to numerous discrepancies between the physical characteristics of Dillinger and the man killed outside the Biograph, as well as Nash's belief that the FBI "planted" Dillinger's fingerprints at the Cook County morgue. *Id.* at 103–21, 231–35. Nash also offers other facts, including interviews which, he argues, support and flesh out his version of Dillinger's life.

On March 8 and August 16, 1984, defendant CBS aired an episode of the television series "Simon and Simon." The defendants each had various responsibilities in the writing, editing, producing, and broadcasting of the episode, which was entitled "The Dillinger Print." The plot line of "The Dillinger Print" runs as follows: A retired FBI agent, who believes that Dillinger did not die in 1934, is mysteriously murdered with Dillinger's old pistol. Plaintiff's Reply Memorandum at Exhibit C, 2. Investigation reveals that the gun bears the fresh fingerprint of John Dillinger. *Id.* at 8. The daughter of the murdered FBI agent then hires the Simons, the show's main characters, to track down the killer. *Id.* at 3–4. In their investigation, the Simons unearth various discrepancies surrounding Dillinger's death in 1934, including some of the discrepancies mentioned in Nash's books. *Id.* at 8–9. In the end, the Simons discover that another person, not Dillinger, killed the retired FBI agent. However, the final scene of the episode is a teaser which suggests that Dillinger may still be alive. *Id.* at 25.

Nash brought this infringement action against the defendants, alleging that "The Dillinger Print" infringed his several copyrighted books on Dillinger. We directed the parties to first brief the issue of whether the material which the defendants allegedly infringed is "copyrightable."

## DISCUSSION

In order to prevail in a copyright infringement action, the plaintiff must show (1) that he owns a valid copyright, and (2) that the defendant copied his protected material. *Atari v. North American*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Because direct evidence of copying is rare, the plaintiff typically proves copying circumstantially by showing (1) that defendant had "access" to the protected material, and (2) that "substantial similarity" exists between the protected works and the allegedly infringing materials. *Id.* On this motion for summary judgment, we are concerned only with "copyrightability," i.e., whether Nash's allegedly protected material can receive copyright protection. Because we confine our attention to "copyrightability," we assume that (1) Nash possesses all necessary attributes of copyright ownership (except, of course, "copyrightability"), and (2) that the defendants copied Nash's material, i.e., that they had access to the material and that "The Dillinger Print" is "substantially similar" to Nash's allegedly copyrightable material.[1]

Defining copyrightability is a difficult task. The problem is perhaps best conceptualized as a continuum. At one end lie pure "facts," which are uncopyrightable. At the other end lie creative works such as poetry and art that are obviously protected. The line dividing protected from unprotected material lies somewhere between these two extremes. In order to determine where Nash's allegedly protected material lies on this continuum, we must first define what in Nash's books is allegedly "copyrightable." Nash contends that his story that John Dillinger did not die in 1934

---

**1.** Because we assume that defendants copied Nash's material, plaintiff's argument regarding

the relative quantum of evidence necessary to show "similarity" is beside the point.

(hereinafter "the Dillinger Story"), is copyrightable.[2]

■ In their submissions, the parties spend much time likening Nash's books to "directories" or other "compilations" of fact and arguing whether case law regarding the copyrightability of directories militates in favor of or against the copyrightability of Nash's Dillinger Story. While Nash's books are similar to directories in that both involve the assembling of facts, we do not believe that "directory" is an accurate description of Nash's work. In our view, the most that the directory case law shows is that the Dillinger Story is not *per se* uncopyrightable because of its factual subject matter.[3] *See, e.g., Schroeder v. William Morrow, Inc.*, 566 F.2d 3, 5 (7th Cir.1977); *Illinois Bell Telephone v. Haines and Co.*, 683 F.Supp. 1204, 1208 (N.D.Ill.1988).

We believe a better description of Nash's books is "historical nonfiction." After all, Nash's books are essentially examinations of the events surrounding the supposed death of an historical figure, John Dillinger. Nash's Dillinger Story is simply his interpretation of historical facts. Nash takes issue with this characterization, arguing that his books are works of fancy and speculation, not nonfiction. While Nash admits that he played fast and loose with the facts in order to create a profitable Dillinger story, Plaintiff's Reply Memorandum at 8, he represented his books to be factual accounts of the bank robber's life and death. For instance, the cover of *The Dillinger Dossier* promises *"[p]roof* that John Dillinger, America's most notorious criminal, lived on for decades after the FBI 'killed' him in 1934." Defendants' Motion for Summary Judgment at Appendix X. Similarly, Nash held out his *Badmen and Bloodletters* to be a reference book on American criminals. *Id.* at Appendix T. "Under the doctrine of copyright estoppel, once a plaintiff's work has been held out to the public as factual, the author-plaintiff cannot then claim that the book is, in actuality, fiction." *Houts v. Universal City Studios*, 603 F.Supp. 26, 28 (C.D.Cal.1984); *see* Nimmer, *Law of Copyright*, § 2.11(c) (1978). Thus, Nash is estopped from claiming that his Dillinger Story is fictional.

Having established that Nash's Dillinger Story is historical nonfiction, we turn to the case law dealing with such materials. In *Toksvig v. Bruce Publishing*, 181 F.2d 664 (7th Cir.1950), the plaintiff wrote a biography of Hans Christian Anderson and relied exclusively upon Danish language sources in her research. Sometime later, the defendant authored another Anderson biography, although she utilized only English language sources including plaintiff's book. In fact, the defendant lifted 24 passages from plaintiff's book. The Seventh Circuit rejected the defendant's argument that, because the facts of Anderson's life are in the public domain, plaintiff's biography was not copyrightable. The precise reasoning behind the *Toksvig* decision is unclear. In its opinion, the court emphasized that plaintiff was the first to translate the Danish sources and that translations are generally copyrightable. Yet, the translation of factual material cannot make the facts themselves copyrightable. Moreover, the *Toksvig* court focused upon the substantial research plaintiff conducted in preparing her

---

**2.** Our review of *The Dillinger Dossier* and *Bloodletters and Badmen* shows that these books do in fact contain the Dillinger story. Nash has not submitted copies of *Citizen Hoover* and *Dillinger: Dead or Alive*, other books which allegedly contain Nash's Dillinger Story. Therefore, we reserve judgment on whether these books contain copyrightable material.

**3.** Nash also alleges that his selection of photographs contained in the *Dillinger Dossier* is copyrightable and that the defendants infringed on his rights by using those pictures in the "Simon and Simon" episode. The defendants claim that they used "freeze-frame" shots from a film whose copyright is owned by defendant MCA. The defendants' argument is beside the point on this motion. We hold that Nash's selection and compilation of photographs, like any other compilation or list of matters in the public domain, is "copyrightable." *Rockford Map Publishers, Inc. v. Directory Service of Colorado*, 768 F.2d 145, 147 (7th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986). *See Schroeder v. William Morrow*, 566 F.2d 3 (7th Cir.1977). Again, we address only copyrightability; whether the defendants copied Nash's selection of photographs is a separate issue.

book, relative to that undertaken by the defendant. Contrary to Nash's contention, though, the *Toksvig* court never explicitly held that research itself is copyrightable. Regardless of the precise reasoning employed by the court, *Toksvig*, at a minimum, stands for the proposition that works of historical nonfiction can be copyrightable.

Seven years later, in *Eisenschiml v. Fawcett Publications*, 246 F.2d 598 (7th Cir.), *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957), the Seventh Circuit held that the defendant who wrote an article entitled "America's Greatest Unsolved Murder?" did not infringe plaintiff's copyrighted books about Lincoln's assassination. Both the plaintiff's books and the defendant's article suggest that Lincoln's murder may have been the product of a conspiracy. In proceedings below, "the Master and the District Court found that whatever use [the defendant writer] made of plaintiff's work is not actionable 'because it was an insignificant use, a fair use, or use of noncopyrightable material.' " *Id.* at 603. The Seventh Circuit held that these findings were not clearly erroneous, but expressed some hesitation about the result. The court noted that "a number of extracts from plaintiff's works were used in the [defendant's] article, [and that] infringement is not confined to literal and exact repetition or reproduction." *Id.* The Seventh Circuit explained as follows:

> Ideas, as such, are not protected by the law of copyright. But the mode of expression used by the author can be protected. The association, arrangement and combination of ideas and thoughts and their form of expression may make a particular literary composition which is entitled to protection.

*Id.* at 603 (citations omitted). This language seems to cut in favor of holding that interpretative theories based on historical facts are copyrightable. Though the court found no infringement in *Eisenschiml*, it believed that the case presented a "very close question." *Id.* at 604.

■ In sum, *Toksvig* and *Eisenschiml* do not clearly articulate the extent to which works of historical nonfiction are copyrightable. The Supreme Court has recognized this unclear area of copyright law: "[I]n the realm of factual narrative, the law is currently unsettled regarding the ways in which uncopyrightable elements combine with the author's contributions to form protected expression." *Harper and Row Publishers v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 2224, 85 L.Ed. 2d 588 (1985). Fortunately, we need not define in this case the limits of protected expression in the area of historical nonfiction. We believe that the holding in *Toksvig* and the above-quoted language in *Eisenschiml* show that interpretative theories contained in historical nonfiction are susceptible to copyright.[4] Therefore, we hold that Nash's Dillinger Story, as expressed in his books, is copyrightable.

Our holding is very narrow. We hold only that Nash's interpretive Dillinger Story is copyrightable. Neither the idea that Dillinger did not die in 1934 nor the historical facts cited by Nash in support of the Dillinger Story are protected. *See Rockford Map Publishers, Inc. v. Directory Service Company of Colorado*, 768 F.2d 145, 149 (7th Cir.1985). Moreover, because of the narrow issue raised by these cross-motions, we do not reach the question of whether "The Dillinger Print" is "substantially similar" to Nash's copyrightable Dillinger Story or whether "The Dillinger Print" constituted "fair use" of the Story.

In their briefs, the defendants strenuously argue that *scenes a faire* analysis renders Nash's Dillinger Story uncopyrightable. According to defendants, because Nash's Story relies primarily upon uncopyrightable *scenes a faire* (defined as "incidents, characters, or settings which are, as a practical matter, indispensable, or at least

---

4. The defendants frequently cite *Hoehling v. Universal City Studios*, 618 F.2d 972 (2d Cir. 1980), which held that the plaintiff author's theory concerning the destruction of the Hindenburg blimp was not copyrightable. This case is not binding authority in this circuit. The *Hoehling* court "repudiated" *Toksvig*, 618 F.2d at 979, but *Toksvig* has not been overturned by the Seventh Circuit.

standard, in the treatment of a given topic," *Atari v. North American*, 672 F.2d 607, 616 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982), we should hold that the Story is uncopyrightable as a matter of law. We disagree. First, it is unclear under Seventh Circuit case law whether or not *scenes a faire* are copyrightable. For example, in *Atari, supra*, the Seventh Circuit stated that "stock literary devices [apparently referring to *scenes a faire*] are not protectible by copyright." 672 F.2d at 616. Yet, in the same opinion, the court also stated that *scenes a faire* "receive protection only from virtually identical copying," *id.* at 617, thereby recognizing that *scenes a faire* receive at least some copyright protection. If the latter passage is an accurate statement of the law, then the *scenes a faire* doctrine limits only the scope of a given material's protection, not its copyrightability.

In any event, even assuming that many of the basic facts surrounding Dillinger's life are *scenes a faire*, Nash's Story involves more than a recounting of those facts. Nash interprets those facts and spins his own tale of what happened immediately before and after Dillinger's supposed death. Nash's explanation of these facts is copyrightable, even if the basic facts are not. *See Rockford Map Publishers, Inc. v. Directory Service of Colorado*, 768 F.2d 145, 149 (7th Cir.1985). The contribution of a collection of facts lies in their presentation, not in the facts themselves. If an interpretive historical theory were always uncopyrightable because the facts pertaining to the historical subject matter were considered *scenes a faire*, then it is difficult to imagine how any work of historical nonfiction could receive copyright protection. However, such works are protected under our reading of *Toksvig* and *Eisenschiml*. Therefore, Nash's Dillinger Story

is copyrightable, even under *scenes a faire* analysis.[5]

To summarize, we hold that Nash's Dillinger Story is copyrightable. Therefore, we grant the plaintiff's motion for summary judgment on the issue of copyrightability. Contrary to defendants' contention, the "cornerstone" of plaintiff's copyrightability theory is not the defendants' failure to perform independent research. The extent of defendants' research goes to the issues of "copying" and "fair use." Moreover, just because defendants dispute the "originality" of Nash's work, we are not obligated to deny the plaintiff's motion. The narrow issue before us is the "copyrightability" of the Dillinger Story. On this motion, we assume that Nash has met all the other requirements for owning a valid copyright, including originality. Defendants, of course, are free to raise their originality argument on subsequent motions or at trial.

CONCLUSION

We grant Nash's motion for summary judgment on the issue of copyrightability. We deny the defendants' motion for summary judgment on the same issue. A status hearing is set for August 9, 1988 at 9:30 a.m. to discuss the filing of any further motions, to determine what discovery has been done, and to set a discovery cutoff date.

---

5. We intimate no opinion as to what effect the *scenes a faire* doctrine may have upon Nash's ability to show "substantial similarity," one of the showings necessary to prove circumstantially that defendants "copied" his Dillinger Story. Nash may not rely primarily upon *scenes a faire* to show that "substantial similarity" exists between his Dillinger Story and the defendants' "Simon and Simon" episode. *See Atari*, 672 F.2d at 617 (similar, but not identical, maze design, scoring table and "dots" utilized as video games are treated as *scenes a faire*, thereby "preclud[ing] finding of infringement on that basis alone"). Because on this motion we consider only the issue of copyrightability, we will not address whether any of the alleged similarities between Nash's Dillinger Story and "The Dillinger Print" are *scenes a faire*.