The **ROBERT STIGWOOD GROUP LIMITED** et al.

v.

**John T. O'REILLY** et al.

**Civ. No. B–501.**

United States District Court,
D. Connecticut.

July 25, 1972.

Robert Osterberg, Abeles & Clark, New York City, John F. Clancy, Clancy, Kenney & Ford, Bridgeport, Conn., for plaintiffs.

Gregor Neff, Pasquale Razzano, New York City, William D. O'Reilly, Wilmington, Mass., for defendants.

## RULING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

ZAMPANO, District Judge.

The plaintiffs' application for a preliminary injunction[1] raises interesting and novel questions with respect to the so-called "charitable and educational exemption", see Nimmer, Copyright, § 107.33 (1963), in the Copyright Act, 17 U.S.C. § 104, which provides in pertinent part that:

[N]othing in this title shall be so construed as to prevent the performance of religious or secular works such as oratorios, cantatas, masses, or octavo choruses by public schools, church choirs, or vocal societies, rented, borrowed, or obtained from some public library, public school, church choir, school choir, or vocal society, provided the performance is given for charitable or educational purposes and not for profit.

Although the Second Circuit on three occasions[2] in the last year enunciated controlling principles concerning alleged "pirate" performances of the rock opera *Jesus Christ Superstar*, the unique defenses presented by the defendants required that this Court hold extensive hearings on the issue.[3] Oral arguments by counsel having been heard and comprehensive briefs having been filed, the matter is now ripe for decision.

## I. THE PLAINTIFFS

Timothy Rice and Andrew Lloyd Webber created and wrote the musical work entitled *Jesus Christ Superstar,* a rock opera depicting the last seven days in the life of Christ. The rights in the work (exclusive of "King Herod's Song"), were assigned to plaintiff Leeds Music Limited, which secured copyrights for the opera as a "dramatico-musical composition" under 17 U.S.C. § 5(d). After plaintiff Leeds Music Limited assigned the United States copyrights to plaintiff Leeds Music Corporation, the plaintiff Robert Stigwood Group Limited ("Stigwood"), acquired by assignment the professional stage rights to the opera.

The plaintiffs contend the defendants have infringed in the past and intend in

1. This Court issued a temporary restraining order on May 5, 1972, which was dissolved on May 15, 1972, pending this decision on plaintiff's application for a preliminary injunction.

2. The Robert Stigwood Group Ltd. v. Hurwitz, 457 F.2d 50 (2 Cir. 1972); The Robert Stigwood Group Ltd. v. Sperber, 457 F.2d 50 (2 Cir. 1972); Rice v. American Program Bureau, 446 F.2d 685 (2 Cir. 1971).

3. Hearings were held on May 15, June 1, 2, 15 and 16, 1972.

the future to infringe the copyrights held by the plaintiffs.

## II. THE DEFENDANTS

The defendants, John T. O'Reilly, Jack Coyne, and Robert Cassidy, are ordained priests in the Roman Catholic Church. They, together with Father Patrick Berkery, Father Donald Middendorf, Father Joseph Valentine, and Brother Richard Palmese, presently comprise the Contemporary Mission, a nonprofit charitable corporation organized under the laws of the State of Missouri.

The record is replete with evidence that the defendants and the other members of their group are sincere and dedicated men who, through their "musical ministry", have performed innumerable acts of charity, aided the poor and disadvantaged, and attempted to influence the lives of youngsters, Catholic and non-Catholic.

As seminarians in the Minor Seminary of the Montfort Fathers in St. Louis, Missouri, the defendants worked and taught in the ghetto areas of St. Louis. Touched by the deep suffering and misery they witnessed, and recognizing the importance of music as a vehicle to impress the young, the defendants conceived the idea of musical preaching by using modern music to convey the messages of the Gospels. A group known as the Montfort Singers was formed to implement their concept of music as an apostolate.

In January, 1968, the Provincial Superior of the Montfort Fathers became disenchanted with these activities. As a result Father Berkery and the defendants, and other seminarians with the consent of the Superior General in Rome, disassociated themselves from the Montfort Fathers and formed a new organization known as the Montfort Mission. The members of the Mission took residence in the slums of St. Louis to pursue their experimental ministry and training programs. Soon several of the Mission's members, under the name of the Mission Singers, became a nationally known folk-rock group. They composed and published songs with religious themes, recorded albums of religious music, gave many concerts, appeared on the Ed Sullivan Show, Kraft Music Hall, and Merv Griffin Show among others, wrote several religious books, and instituted new teaching methods in schools through an audio educational tool known as "DiscoTeach." In addition, as priests, they performed the usual functions (Mass, Confession, etc.) of their religious calling, and continued their charitable works in feeding, housing and aiding the poor. All the income from their musical works and performances was used to support themselves and their charitable deeds; none received a personal share as his own. In September, 1968, the Montfort Mission filed a "Certificate of Amendment of a General Not For Profit Corporation" and changed its name to the "Contemporary Mission", which also was awarded a tax exempt status from the Internal Revenue Service.

In the summer of 1971, Bob Yde, a professional promoter, aware of the "fantastic Jesus climate", contracted with the Mission Singers to join his road show "Jesus Revolution", which later played to audiences across the country under "Hard Job Being God." Yde then decided to incorporate *Jesus Christ Superstar* into the performances. Several of the Mission Singers were employed in important technical positions in the show: Father O'Reilly was the musical director of the cast, Father Middendorf was the road manager, and Brother Palmese was both the sound and lights director.

On September 27, 1971, the Contemporary Mission, through Father O'Reilly, entered into a contract with Bob Yde Associates, Inc. "to perform in our concert presentation of *Hard Job Being God* and *Jesus Christ Superstar*" for a fee of $4,000 during each week when there was a public performance. During this time the group performed under the designation "International Rock Opera Company" (hereinafter "Company").

In October, 1971, Yde and the defendants dissolved their relationship, and Father O'Reilly with the other members

of the Contemporary Mission "decided to take over" the Company and proceeded to perform *Jesus Christ Superstar* in over 50 performances to date in several states. Although some of the defendants have membership in artistic unions, none is licensed under an agreement with the American Society of Composers, Authors and Publishers to publicly perform any song from *Jesus Christ Superstar*. It is the Company as a group, and not solely the defendants as a group, that is the allegedly infringing body.

### III. THE ISSUES

There is no question that the plaintiff Leeds Music Corporation holds the United States copyrights for the opera *Jesus Christ Superstar* as a "dramatico-musical composition", and that the plaintiff Stigwood possesses the rights for the stage productions and dramatic presentations. As a prima facie matter, therefore, the plaintiffs' copyrights should be protected, and the defendants should be enjoined from any further infringements of these copyrights. See Robert Stigwood Group Limited v. Sperber, supra, n. 2.

The defendants contend, however, that: 1) they and their Company are exempt from the provisions of the Copyright Act under § 104; 2) injunctive relief violates their rights under the First Amendment; and 3) the use which is made of the opera is "fair use."

### IV. SECTION 104

Section 104 has been characterized by scholars as "meaningless", Nimmer, supra, § 107.33, "curious", Shafter, Musical Copyright, pp. 287–288 (1939), and having "inapt phraseology", Weil, American Copyright Law, p. 497 (1917). It provides in effect an exemption to the copyright laws when certain religious and secular works are performed by public schools, church choirs, or vocal societies, if the performances are given for charitable or educational purposes and not for profit.

Section 104 first appeared in the Copyright Act of 1909 and was carried forward into the present law without change. The entire legislative discussion on its passage is set forth in H.R. Rep. No. 2222, 60th Cong., § 328:

> The existing law provides that any person publicly performing a dramatic or musical composition without the consent of the proprietor of the copyright shall be liable for damages of not less than $100 for the first and $50 for every subsequent performance, and this prohibition covers cases of public performances where the performance is not for profit. We have provided in this section that where the public performance is given by public schools, etc., for educational or charitable purposes and not for profit, it may be done without subjecting those who give the performance to any suit for damages, and we further provide that the music used for the performance may be rented, borrowed, or obtained from public libraries, or other public schools, etc.

The only judicial interpretation of the exemption clause is in John Church Co. v. Hilliard Hotel Co., 221 F. 229, 230 (2 Cir. 1915), rev'd on other grounds, 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511, (1917), wherein the court stated by way of dictum:

> We think it was to permit certain high-class religious and educational compositions to be performed at public concerts where an admission fee is charged, provided the proceeds are applied to a charitable or educational purpose.

■ The first issue that must be resolved is whether § 104 is applicable at all. The plaintiffs, relying on an outstanding authority on copyright law, argue that the provision appears "to be a meaningless exemption since even without it a performance of a musical work not for profit will not constitute an infringement, and this regardless of whether or not the performance is for charitable or educational purposes." Nimmer, supra, § 107.33. The underlying support for the conclusion is found in three other sections of the Act: §§ 1(e) and 1(c) which state that an unauthorized public performance of a musical

composition or of a nondramatic literary work will infringe only if the performance is for profit, and § 1(d) which provides that an unauthorized public performance of a dramatic work infringes regardless of whether it is for profit.

█ The Court is of the opinion that the provision has a meaning and a purpose. A court should be most reluctant to hold that a Congressional enactment is "meaningless." The legislative history, meager as it is, indicates that Congress intended to carve out an exception to § 1(d), as well as § 1(e), possibly along the lines suggested by the Second Circuit in the *Church* case. Cf. Howell, The Copyright Law, pp. 134–135 (1948). Congress probably had in mind that school children, church choirs, and small vocal groups, banded together as a "society", should not be restricted by civil and criminal penalties, that the benefits derived from such works should be available to them for educational and religious purposes, and that it would be highly unlikely that their performances of the works would seriously diminish attendance at professional productions of the same works.

█ Thus the Court must consider whether the defendants, on the present state of the record, sustained their burden of proof with respect to the requirements relevant to this case as set forth in § 104 that: 1) they are a church choir or vocal society who 2) perform a work such as an oratorio, which 3) was rented or obtained from a public library, public school, church choir, school choir, or vocal society, for 4) charitable or educational purposes and not for profit.

*Church Choir or Vocal Society*

The parties appear to give scant attention to what the Court believes is a most significant essential element of the statutory exemption; that is, that the group seeking the exemption must be either a public school, church choir, or vocal society. Perhaps the voluminous extent of the evidence concerning the hotly contested charitable aspects of the Contemporary Mission diverted counsel's attention.

In any event, the Court is of the firm opinion that, regardless whether the Contemporary Mission qualifies as a church choir or vocal society, the International Rock Opera Company certainly cannot be so classified.

Actually the Company is a real party in interest; the members of the Contemporary Mission comprise only a small segment of that band of performers, and none performs a leading role. Although Fathers O'Reilly, Middendorf, Coyne and Valentine, with Brother Palmese, are directly associated with the Company, over 20 other members of the Company are professional actors and musicians who are not clergy and who are hired and perform for personal profit. There is no question, however, that the defendants own and control the Company.

The Company is not a church choir. The performances of *Jesus Christ Superstar* are not given in churches nor are they part of any church services; rather they are highly professional productions, presented in school auditoriums and theaters across the country. Fifty performances to date grossed $300,000; the Company's net income has been approximately $220,000. The mere fact that the many professional performers are under the direction of a few priests cannot turn a professional touring company into a church choir.

█ Nor is the Company a vocal society. As the Court reads the meaning of this phrase in the statute, in the light of the apparent intent of Congress, it connotes an enduring, cooperating and unified group of singers, with common aims and ends, periodically meeting together because of a community of interest in the songs they sing. The defendants failed to produce a scintilla of evidence that, except for the five members of the Contemporary Mission, the remaining members of the Company share a clearly marked identity as a unit distinguished by similar beliefs, particular concerns, and the same interests. From the present record, it appears that the lay performers are professionals selected for their singing and musical abilities,

and not because of homogeneous beliefs, charitable motives or religious affiliation.

Therefore, the Court finds that the defendants, doing business as and in association with the International Rock Opera Company, are neither a church choir nor a vocal society, within the meaning of those terms as used in § 104.

*Oratorio*

■ Much has been presented by the parties concerning whether the defendants' production of *Jesus Christ Superstar* is an oratorio or an opera. The major premise for the argument, according to the parties, is that an oratorio is within the scope of § 104 while an opera is not. The Court disagrees with this reasoning. The phraseology of the pertinent portion of the statute contains the general words "such as" which precede the particular classes of works set forth. Therefore, since the similarities between an oratorio and an opera are significant, in the context of the present subject matter (defendants' expert was of the opinion that their performance of *Jesus Christ Superstar* was a "hybrid" between an oratorio and a rock opera), the application of the principle *ejusdem generis* is proper and, therefore, § 104 includes within its boundaries an opera or a rock opera.

However, assuming that the factual differences raised by the parties were not resolved by the rule of *ejusdem generis*, the Court adopts the plaintiffs' analysis, i. e., the defendants' performances are performances of the rock opera *Jesus Christ Superstar*.

*Source of the Material*

■ The Court agrees with the defendants that a group that otherwise qualifies for a statutory exemption under the Act may obtain the lyrics and music for the work from the sources specified in § 104 in addition to any other available source. It is difficult to conceive that Congress would grant a broad exemption to a qualified group on the one hand, and then, at the same time, unduly restrict them on such a highly technical point.

*Charitable and Educational Purposes*

Several days of testimony was devoted to this issue because of the plaintiffs' contentions that the defendants are "sham" priests whose main interest is the acquisition of personal wealth. For example, the plaintiffs claimed that the defendants' ordination was invalid under canon law. As could be expected, this argument provoked considerable indignation and testimony on the part of the defendants.

■■ In the light of the Court's ruling that the Company is neither a church choir nor a vocal society, there is no need to resolve this issue. Moreover, a court should refrain from determining ecclesiastical questions in the process of resolving property disputes. Cf. Presbyterian Church v. Hull Church, 393 U. S. 440, 446–447, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). (Upon reflection, the Court's admission of plaintiffs' Ex. 6 was erroneous; the newspaper articles are clearly hearsay utterances which cannot be considered as affirmative proof for plaintiffs' contentions on this issue).

The plaintiffs also contend that the defendants' performances were not given for charitable or educational purposes and not for profit, within the meaning of § 104. The factual record necessary to resolve this issue is largely undeveloped and, therefore, final determination of the question must await the trial.

## V. FIRST AMENDMENT DEFENSE

■ The defendants next assert that if the provisions of the Copyright Act are applied to prevent them from performing *Jesus Christ Superstar*, the injunction would violate their rights under the First Amendment to the Constitution. They contend essentially that: 1) their performance of the work in concert is the exercise of their musical ministry; 2) their version of the rock opera is a "form of protest to preserve the true Gospel story", and a counter-attack to the plaintiffs' presentation, which is a "sick, distorted, perverted version of the Gospel story"; and 3) they have a

free-speech right to express themselves through the lyrics and music of the plaintiffs.

 The short answer to the defendants' absolutist approach to the meaning of the First Amendment is that it is simply not the law. Were the First Amendment to be applied literally, our statutes pertaining to perjury, obscenity, mail fraud, among many others, would constitutionally fall. While the Court must be alert to protect the defendants' right to a free exercise of their religious beliefs, it must recognize that the "free exercise" does not include the wholesale appropriation of another's literary, artistic and musical works. In the balance must be weighed the constitutional right of authors to have "the exclusive right" to their "writings." U.S.Const. art. I, § 8, cl. 8, and the need to

protect those of ability who justifiably seek compensation for their ingenuity and labor. It is settled law that Congress may confer copyright protection to writers and publishers to secure their monetary reward and to afford encouragement for the production of literary or artistic works. Cf. Mazer v. Stein, 347 U.S. 201, 206, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954).

 The plaintiffs do not possess copyrights to the Biblical narration, characters, or sequence of events of the last seven days of Christ. They do, however, have rights to their original musical *expression* of those last days of Christ. The defendants' attempt to demonstrate the similarity between the language of the Gospels and the lyrics in *Jesus Christ Superstar* finds very little support in the record.[4] It is clear that

---

4. While the cast of characters and scenes in the plaintiffs' production have been taken from the Biblical passages, the Court finds that the defendants failed to demonstrate that the lyrics of *Jesus Christ Superstar* are extracts from the Biblical narration. No useful purpose will be served by setting forth the defendants' chart of comparisons between the lyrics of *Jesus Christ Superstar* and the text from the Bible. For illustrative purposes, however, a few comparisons submitted by the defendants which the Court finds unpersuasive are:

| *Text From The Bible* | *Lyrics From Plaintiffs' Production* |
| --- | --- |
| So Jesus went with them to Nazareth, where he was obedient to them . . . and Jesus grew up both in body and in wisdom. Luke 2:51–52 | Nazareth, your famous son should have stayed a great unknown. |
| The disciples looked at one another completely, confused about what he meant. John 13:22 | What's the buzz? Tell me what's happening. |
| Jesus spoke up and said, "Simon, I have something to tell you." Luke 7:40 | Neither you Simon nor the fifty thousand . . . understand at all. |
| Jesus added, "Listen then, if you have ears to hear with . . . the knowledge of the secrets of the kingdom of God has been given to you; but to the rest, it comes by means of parables, so that they may look but not see, and listen but not understand. Luke 8:9 | Understand what power is, Understand what glory is Understand at all Understand at all |

the plaintiffs' lyrics are original, highly creative, and even controversial, expressions of the Biblical passages. As such, they are within the protection of the Copyright Act.

■ Moreover, it is difficult to find any justification for defendants' claim that plaintiffs merely copied the score for *Jesus Christ Superstar* from the Bible. The Biblical passages in question contain no musical notes.

Finally, the defendants' argument that their presentation of the rock opera is a form of "protest" which portrays the "true" events in the life of Christ is not persuasive. The defendants' performance is almost identical to the plaintiffs' production, except for the scenery, costumes, physical characteristics of the actor portraying Christ, the intimate scenes between Christ and Mary Magdalene, and the finale, in which the defendants present a medley of the songs to emphasize the resurrection of Christ rather than the death of Christ. While the defendants, from a theological point of view, sincerely feel these changes are material variations, the Court is satisfied that, from a realistic, practical standpoint, they are really minor variations. The defendants have copied in wholesale fashion the lyrics and score, the sequence of songs, and the overall pattern of plaintiffs' rock opera; there is outright plagiarism here, pure and simple. Cf. Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2 Cir. 1930), cert. denied, 282 U.S. 902, 51 S. Ct. 216, 75 L.Ed. 795 (1931).

This ruling, in the Court's opinion, in no way interferes with the defendants' rights to free speech or to the free exercise of their religion. They are perfectly free to compose and sing their own musical interpretation of the events of the last seven days of Christ; however, insofar as they chose "to avoid the expenditure of time and skill necessary to evolve their own expressions, and instead copied the plaintiff's expression, there can be no first amendment justification for such copying." Nimmer,

Copyright And The First Amendment, 17 U.C.L.A.L.Rev. 1180, 1203 (1970).

## VI. FAIR USE

■ The final contention advanced by the defendants is that their use of the plaintiffs' material constitutes a "fair use." They support this claim on substantially the same factual basis advanced in their attempt to sustain their arguments under the First Amendment.

The defendants assert the plaintiffs' production "clearly is an unfavorable and offensive comment on the Passion and Death of Jesus, and is offensive to long-held Christian beliefs about Him." They point out that their presentation, in addition to other differences, portrays Christ as a strong masculine individual who has no physical contact with Mary Magdalene, while the plaintiffs' production reveals an effeminate, uncertain Jesus who has a "carnal relationship" with Mary Magdalene. They submit further that the plaintiffs' Christ is "only a man who merely dies at the end of his ordeal", while the defendants' Christ "sends forth the Christian message that Jesus not only died, but rose again on the 'third day' to fulfill the Hebraic prophesies that He was the Messiah." Therefore, they argue, the defendants' performance is within the scope of the fair use doctrine as a "literary and religious criticism of the plaintiffs' work."

Although it has been said that the issue of fair use "is the most troublesome in the whole law of copyright", Dellar v. Samuel Goldwyn, Inc., 104 F.2d 661, 662 (2 Cir. 1939), it seems crystal clear to the Court that defendants' almost total copying of plaintiffs' work cannot possibly be considered a "fair use." Cf. Leon v. Pacific Telephone & Telegraph Co., 91 F.2d 484, 486 (9 Cir. 1937). In applying the relevant criteria, see Sobel, Copyright and the First Amendment: A Gathering Storm? in 19 Copyright Law Symposium 43 (1971), the defendants' production: 1) is obviously a substitute for plaintiffs' work; 2) copies almost

all of the plaintiffs' lyrics, score, and sequence of songs; 3) undoubtedly has and will injure plaintiffs financially; 4) is definitely in competition with plaintiffs' performances; and 5) does not serve or advance the greater public interest in the development of news, art, science or industry. See also Berlin v. E. C. Publications, Inc., 329 F.2d 541, 544 (2 Cir.), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964); cf. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 310–311 (2 Cir. 1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

■ Moreover, no case or recognized scholar in the field of copyright law, at least to the extent of this Court's knowledge, supports defendants' position. A careful review of the pertinent authorities discloses no suggestion that the doctrine of fair use protects a defendant who copies practically verbatim the plaintiff's work, but adds a few variations in order to make the plaintiff's production a "better" one. See, e. g., Rosemont Enterprises, Inc. v. Random House, Inc., supra; Time Inc. v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968); Goldstein, Copyright and the First Amendment, 70 Colum.L. Rev. 983, 1011 (1970); Nimmer, Copyright and the First Amendment, supra; Sobel, Copyright and the First Amendment: A Gathering Storm?, supra. As was aptly stated by the court in Benny v. Loew's Inc., 239 F.2d 532, 537 (9 Cir. 1956), aff'd per curiam 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958), in rejecting the claim that wholesale copying was permissible if there was an intent to be "critical" of the original work: "One cannot copy the substance of another's work without infringing his copyright."

■

■ This, of course, is not to say that a critical review of another's work cannot be a proper exercise of fair use. It would seem that critics may quote extensively in order to comment effectively. But here the defendants' use of plaintiffs' work far exceeds any reasonable reproduction for the purposes of criticism, comment, or review.

## VII. INJUNCTIVE RELIEF

■ The Court, being of the opinion that the plaintiffs will probably succeed at trial, that irreparable harm has been demonstrated, and that injunctive relief should be granted to prevent further infringing performances, see Robert Stigwood Group Limited v. Sperber, supra, n. 2, at 55; Rice v. American Program Bureau, supra, n. 2, at 688; it is hereby

ORDERED:

That the defendants, their agents and servants, acting in concert in, with, or through The International Rock Opera Company, or any similar group or organization, are hereby enjoined from, directly or indirectly,

1. infringing the said copyrights of the plaintiffs or interfering with the rights of the plaintiffs thereunder in any manner;

2. performing, contracting for, promoting, advertising, participating in or in any way aiding or abetting performances of the copyrighted work entitled *Jesus Christ Superstar*, or any segment thereof; and

3. utilizing, or permitting the use of, any advertisements, publicity or representations which refer to *Jesus Christ Superstar* or *Superstar*.