**HUSTLER MAGAZINE, INC., a California corporation, Plaintiff,**

v.

**MORAL MAJORITY, INC., a District of Columbia corporation; Old Time Gospel Hour, a Virginia corporation; Jerry Falwell, an individual; and Does 1–20, inclusive, Defendants.**

No. CV 84–6399 RG.

United States District Court, C.D. California, Los Angeles Division.

April 23, 1985.

Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for plaintiff.

James E. Merriman, Pacific Palisades, Cal., for defendants.

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT

GADBOIS, District Judge.

This is an action for copyright infringement by Hustler magazine ("Hustler"), the pornographic publication perhaps known best for its controversial publisher, Larry Flynt. The defendants are some of the plaintiff's staunchest critics: the Reverend Jerry Falwell, the fundamentalist minister of national repute; the Moral Majority, a political lobbying group for conservative causes; and the Old Time Gospel Hour, the corporate sponsor of television and radio broadcasts of religious services originating in Lynchburg, Virginia. Plaintiff seeks both an injunction and an award of damages based on defendants' unauthorized dissemination of hundreds of thousands of copies of a single page from Hustler's November, 1983 issue.

This court has jurisdiction over this action under 28 U.S.C. § 1338(a) (1982). Venue is proper.

The copyrighted work in question is a parody of an advertisement for Campari liquor and prominently features a photograph of Falwell. Entitled, "Jerry Falwell talks about his first time," Hustler's parody patterns itself on the genuine Campari ads, which consist of interviews with famous persons about their "first time" with Campari. The satire incorporates the advertisements' layout and design (including Campari's copyright notice), the same format in its text, and the same general tone of double entendre. In Hustler's version, however, Falwell's "first time" involves not only Campari but also an outright sexual experience—with his mother and in an outhouse—and the "interview" is appropriately replete with scatological attempts at humor. A purported disclaimer, reading, "AD PARODY—NOT TO BE TAKEN SERIOUSLY," appears at the bottom of the page in very small print.

The Copyright Office registered the copyright certificate for Hustler's November issue on October 3, 1983, and the issue would have been available for purchase on the newsstands in early October. On October 7, 1983, the chairman of Campari's advertising agency wrote a letter to Hustler publisher Larry Flynt and his wife Althea, complaining with "great shock and dismay" of the ad parody and demanding that the magazine cease using the Campari label in any manner. Hustler republished the parody in its March, 1984 issue.

The Reverend Falwell's response to the "ad and personality parody," as the magazine calls it, included both swift legal action and a series of impassioned communications with his constituents. On October 31, 1983, Falwell commenced a lawsuit against

Hustler, Larry Flynt, and Flynt Distributing Company, in the United States District Court for the Western District of Virginia, asserting claims for libel, invasion of privacy and intentional infliction of emotional distress. On December 8, 1984, the jury returned a verdict against Hustler on the emotional distress claim, awarding Falwell $200,000 in general and punitive damages. The jury found for Hustler, however, on the defamation claim, specifically finding as part of a special verdict that the Hustler publication could not reasonably be understood as describing actual facts about Falwell or actual events involving him. The trial court had earlier directed a verdict for Hustler on the invasion of privacy claim.

The communications said to infringe Hustler's copyright occurred in a barrage of letters and television appeals. On November 15, 1983, Falwell sent out two mass mailings to members of the Moral Majority. One set of letters was directed to some 458,370 "rank-and-file donors," who were asked to contribute amounts up to $50; the other went to some 26,980 "major donors," who were asked for $500.

The contents of the two sets of letters mailed November 15 were very nearly identical. Falwell reported the "tasteless and libelous attack on my mother and me" by " 'Porno King' Larry Flynt" and sought contributions to wage a legal battle against him in federal court. He also included a copy of a photograph of his mother. The two mailings differed, however, in that the rank-and-file solicitation merely described the ad pardoy, while the major-donor version actually included a copy of the item, with several particularly objectionable words edited out. The letter asked that the recipient destroy the copy after reading it. The major-donor solicitation brought in nearly $45,000 in donations.

On November 18, 1983, Falwell sent out another mailing, this time to 725,586 followers of the Old Time Gospel Hour. This letter also included a similarly edited copy of the Campari ad parody. The Old Time Gospel Hour appeal, however, did not seek funds for a legal battle but rather for a "survival fund" Falwell had established to finance his television and radio network.

Old Time Gospel Hour received more than $672,000 in response to this appeal.

Finally, on December 4 and 11, 1983, Falwell continued his response to Flynt's parody in the course of his weekly sermon on the Old Time Gospel Hour. At several points Falwell held up Hustler's November issue, with the offending page revealed, and made financial pitches for his survival fund. No figures were provided to the court as to the amount of money received as a result of these television appeals.

The parties do not disagree about the facts but only about what inferences can be drawn from them as to the nature of the copyrighted work and the character of Falwell's use of the ad. From the point of view of Falwell, the "ad" was a searing personal attack that he had to take seriously because, as he stated in his deposition, "what Mr. Flynt has done has not attacked my philosophy to which I do not object but he has attacked me, my morality, my decency, my sincerity." Falwell claims he needed to send his followers a copy of the ad to give them information necessary to rebut the statements it contained, in case the faithful happened to be confronted by someone who had seen it. The appeal for money was no more than an ancillary motive, a regular request that would be made in the course of any such communication.

According to Hustler, however, the "ad" was clearly a parody and so obvious a one that there was nothing to "rebut." Thus, plaintiff points out that Falwell and his aides could not identify a single person who had believed the "charges" in the parody. Moreover, Old Time Gospel Hour's chief executive officer, DeWitt H. Braud, admitted in his deposition that sending along an actual copy of the parody was part of Falwell's "marketing approach" to fund-raising; Moral Majority's executive vice-president Ron Godwin similarly agreed that one purpose of the letter sent out was to raise money. Hustler thus characterizes Falwell's use as commercial, part of a money-making scheme.

■ The matter is before the court on the parties' cross-motions for summary

judgment and for the imposition of sanctions. As there is no dispute that Hustler is the registered owner of the copyrighted work or that Falwell copied it without permission, the court must find that plaintiff has made out a *prima facie* case of infringement. *See Walker v. University Books, Inc.,* 602 F.2d 859, 862 (9th Cir. 1979). Hustler, as the owner of the copyright, had the exclusive right to reproduce and distribute copies of the work and to display it publicly by means of television or other media. *See* 17 U.S.C. §§ 101, 106, 501(a) (1982). The only question, therefore, is whether defendants have established any valid defense as a matter of law. As explained below, the court concludes that defendants' reproduction of the ad parody constituted "fair use" as a matter of law.

DISCUSSION

■ The doctrine of fair use confers a " 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner.' " *Marcus v. Rowley,* 695 F.2d 1171, 1174 (9th Cir.1983) (quoting *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)). Although developed at common law, the defense of fair use was incorporated in the Copyright Act of 1976 ("the Act"), 17 U.S.C. §§ 101–810 (1982).

Section 107 of the statute provides:

Limitations on exclusive rights: Fair use

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

■ The legislative history of section 107 makes it clear that the statute provides only a guideline, leaving the court considerable latitude in determining whether in a given case an alleged infringement is a fair use or not. The Report of the Committee on the Judiciary of the House states:

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts...

. . . .

... [T]he endless variety of situations and combinations of circumstances that can arise in particular cases precludes the formulation of exact rules in the statute. We endorse the purpose and general scope of the judicial doctrine of fair use, as outlined earlier in this report, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.

Section 107, as revised by the committee, is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way. H.R.Rep. No. 94–1476, 94th Cong., 2nd Sess. 65–66 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5679–5680 [hereinafter cited as House Report].

■ Before applying the four statutory factors the court must first decide whether

it may properly dispose of a fair use defense through summary judgment. Such authority as exists appears to be that fair use normally is a question of fact for the jury. *See DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir.1982); *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir.1981); *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1175 (5th Cir.1980); *Eisenschiml v. Fawcett Publications, Inc.*, 246 F.2d 598, 604 (7th Cir.), *cert. denied* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); 3 M. Nimmer, *Nimmer on Copyright* § 13.05, at 13–63 (1984). The United States Court of Appeals for the Ninth Circuit, however, has not yet expressed any position on the subject. For the reasons set forth below this court concludes that the issue of fair use, at least in the context of this case, presents primarily a question of law.

As a practical matter the state of the record in this case facilitates disposing of it now. Both parties have moved the court for summary judgment, and the basic, historical facts upon which the fair use issue depends are undisputed; the only disagreement is over what conclusion should be drawn. At least one court has stated that this is precisely the situation in which fair use can be determined on summary judgment. *Higgins v. Baker*, 309 F.Supp. 635, 637 (S.D.N.Y.1969). Moreover, as the discussion below indicates, the court finds that it can agree with Hustler's factual characterization of Reverend Falwell's use as largely commercial and still conclude that it was fair as a matter of law.

Additional authority for treating this question as a legal one can be gleaned from the Ninth Circuit's reasoning in *Marcus v. Rowley*, 695 F.2d 1171 (9th Cir.1983) and *Universal City Studios, Inc. v. Sony Corp. of America*, 659 F.2d 963 (9th Cir. 1981), *rev'd on other grounds* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), both of which dealt extensively with the doctrine of fair use. In *Marcus* the defendant, a school teacher, had copied several pages of an informational booklet she had prepared from certain copyrighted materials written by plaintiff. Both parties moved for summary judgment, the plaintiff claiming infringement and the defendant asserting fair use. The trial court agreed with defendant and dismissed the action. The Court of Appeals reversed. Rather than remand the case for trial on the question of liability, however, the court entered summary judgment for the plaintiff on the ground that the fair use defense was unavailable under the applicable law. 695 F.2d at 1178–79. The court apparently treated the trial judge's findings with regard to each of the factors as factual determinations subject to the clearly erroneous standard, *id.* at 1177, but the overall conclusion based on a weighing of the factors as a legal one. 695 F.2d at 1179. Similarly, in *Universal City*, the court specifically characterized the doctrine as a "rule of law," before applying the four statutory factors. 695 F.2d at 969.

Finally, the essential character of the fair use doctrine as an "equitable rule of reason," *see Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), makes it all the more appropriate for the court itself to decide whether the fair use defense applies when the historical facts underlying each of the four factors are not disputed. The determination of fair use under section 107 involves applying the statutory factors with careful attention to the policies behind the copyright laws as well as first amendment considerations; fair use is not the sort of factual issue that turns primarily on matters within the common experience of jurors. *See* Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 472 (1983). Under these circumstances the court can decide the question, "even though the process of decision requires the trial court to 'weigh the evidence' on both sides of the argument in deciding what ultimate fact to derive." *Id.* at 473; *see, e.g., Time Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 145–46 (S.D.N.Y.1968) (summary judgment entered for defendant on ground of "fair use" in light of public interest behind defendant's use of plaintiff's copyrighted materials and the apparent absence of any injury to plaintiff).

The court now turns to the factors specified in section 107.

### 1. *The purpose and character of defendants' use.*

The first matter to be considered is the purpose and character of Falwell's use of the ad parody. The evidence on this point indicates that he had more than one motive in acting as he did. A review of the two mailings in question, of the Old Time Gospel Hour sermons, and of the deposition testimony of Falwell's associates suggests that the Reverend's objectives were personal, political, and financial all at once.

It is beyond dispute that each of the alleged acts of infringement contained some element of personal reaction to the parody by Falwell. Thus, for example, the November 15, 1983, Moral Majority letter to the organization's major donors begins:

> It's time to draw the line because this time my enemies have gone too far!
>
> "Porno king" Larry Flynt has, in my opinion, carried his First Amendment rights beyond the limits of civilized discourse—and defiled the good name of my dear mother in the process. (Mother died five years ago at age 82).
>
> Here's the situation ...
>
> Twice in recent issues of the pornographic magazine, *Hustler,* publisher Larry Flynt carried out tasteless and libelous attacks on my mother and/or me.
>
> In one incident, a so-called "parody" of a liquor advertisement, the advertising copy told a story of how my mother and I engaged in illicit sexual acts. (At the bottom of the page, the words "not to be taken seriously" appear—as though this excuses going way beyond what the First Amendment intended to protect).
>
> *I've enclosed an edited copy of the crude "advertisement" for you to see— though I've blocked out the most offensive language because of my respect for you and your family.* (Please destroy the enclosed copy of the "advertisement" immediately after reading it and make sure no one else sees this vulgar material).
>
> ....

> ... And starting right this minute, I intend to defend my dear mother's memory, my wife and children, and my own reputation from further damaging and humiliating assaults from any "porno King" who attacks me.

Letter from Jerry Falwell to Moral Majority's major donors (emphasis in original).

At the same time Falwell evidently seized upon the ad for use in a larger battle, his continuing campaign against assorted groups including publishers of pornography. In this sense Falwell's use of the ad parody was only as a focal point for his well-known brand of moral and social commentary. For example, in the course of his December 4, 1983 sermon on the Old Time Gospel Hour, Falwell made the following remarks:

> I'll admit I got a little mad when I read that article, that ad. I'll admit I almost lost my sanctification, but I believe God used it to stir me up—to say Jerry, don't cut another station, don't quit, don't turn around....
>
> ... I just can't allow pornographers and abortionists and secular humanists and atheists who crucify a frog on the cross to blaspheme Christ to silence me. I can't allow people who come outside my buildings with red hammer and sickle flags to stop me from preaching what I'm preaching. Help me turn this mission around ...
>
> ... There's something else in this magazine. I clipped these pages so you wouldn't see any of the pornography and I'll put my hand over the bottom of the page, but in the same Hustler magazine last month is the Pope of Rome, allegedly—it's phony of course—but allegedly advertising Hustler Magazine and saying some things in the magazine that he likes. Wonder why they they'd attack the Pope? Why would they attack Jerry Falwell? Well, of course, you know why ...
>
> Because we both take a stand against pornography, against abortion, against all the issues, the moral issues that are, I think, vital to our nation's survival. And certainly, near and dear to the heart of God.

All of Falwell's communications on the subject, however, also involved outright appeals for donations to the Moral Majority or Old Time Gospel Hour. Falwell sought contributions both for a lawsuit against Hustler and a so-called survival fund for his radio and television network. An example of how Falwell employed the parody as an integral part of a financial appeal can be found in the November 18, 1983, Old Time Gospel Hour letter:

> I have just established the Old Time Gospel Hour SURVIVAL FUND.
>
> Before Christmas Day, with God's help, I need to raise enough Money to save our television and radio network.
>
> *Make no mistake about it, our situation is very serious.* That is why I am calling this a SURVIVAL FUND ...
>
> ... I was ready to cut another 50–100 stations—when someone showed me a full-page liquor advertisement which appeared in the November issue of *Hustler Magazine*—a pornographic tabloid.
>
> When I saw it—I decided that, in a society containing people like Larry Flynt, the Old Time Gospel Hour must remain on the air—on every station ...
>
> ... After reading that ad, I went to my study in the basement of my home and prayed about what I should do.
>
> I have made up my mind. The Old Time Gospel Hour must not be silenced. I cannot cut more TV stations.
>
> We must go into 1984, the Year of Destiny, with the *entire* Old Time Gospel Hour network intact—and call this nation

back to God. *I cannot surrender to the pornographers.*

Letter from Jerry Falwell to Old Time Gospel Hour contributors (emphasis in original).

Moreover, one of Falwell's top executives conceded that the inclusion of a copy of the ad parody was part of a "marketing approach" to fund-raising, and the court can safely assume that this strategy involved encouraging the faithful to donate money.

■ As Hustler correctly points out, the Supreme Court has stated that unauthorized reproduction of a copyrighted work for a commercial or profit-making purpose would be presumptively unfair. *Sony Corp.*, 104 S.Ct. at 792. But merely because Reverend Falwell's use came in the course of an appeal for donations does not automatically render that use commercial or profit-making in nature. As noted above, Falwell obviously acted out of a variety of motivations. The intent to raise money was not his sole purpose in reproducing copies of the parody for his followers. *Cf. Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 508 F.Supp. 854, 861 (N.D.Ga.1981) (unfair use existed where defendants copied protected work for no purpose other than their own financial gain), *rev'd on other grounds*, 694 F.2d 674 (11th Cir.1983). The Moral Majority and the Old Time Gospel Hour were not selling copies of plaintiff's copyrighted work to their hundreds of thousands of followers.[1]

■ Even if Falwell's use had been purely commercial, the court would con-

---

1. An additional factor supporting defendants' position that their use was not commercial in nature is that defendants were not engaged in profit-making activities. Falwell did not solicit funds for his personal advantage. Rather, the donations went to the Moral Majority and the Old Time Gospel Hour, each of which is a non-stock, nonprofit corporation.

Neither the legislative history of the Act nor the Supreme Court's opinion in *Sony Corp.* expressly defines "commercial" as that term is employed in section 107. They do, however, contrast commercial uses on the one hand with non-profit uses on the other, *see* House Report, *supra*, at 66, *Sony Corp.*, 104 S.Ct. at 792, suggesting that the latter can more easily be catego-

rized as "fair." Although the drafters of the Act eliminated any blanket exemption from the copyright laws for nonprofit corporations, see 17 U.S.C. §§ 106, 110, House Report, *supra*, at 62–3, and 2 *Nimmer*, § 8.15[A] at 8–144.1–8–144.2, the court believes that for the purposes of Section 107(1) the fund-raising efforts of religious, charitable, or political entities not organized for profit should be treated more liberally than the business activities of profit-making corporations.

Of course this is not to say that all such uses are fair under section 107. The court suggests only that unauthorized copying in the context of fund-raising efforts by non-profit organizations should not be treated as *presumptively* unfair.

clude that the presumption of unfairness had been rebutted in this case. Commercial motivation does not in and of itself preclude a finding of fair use. *See MCA, Inc.,* 677 F.2d at 182; *Triangle Publications,* 626 F.2d at 1175 (5th Cir.1980); 3 M. Nimmer, *supra,* § 13.05(A), at 13–69. Rather the court must also consider whether "the alleged infringers copied the material to use it for the same intrinsic purpose for which the copyright owner intended it to be used." *Marcus,* 695 F.2d at 1175; *Jartech, Inc. v. Clancy,* 666 F.2d 403, 407 (9th Cir.), *cert. denied* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982) (same); *see Italian Book Corp. v. American Broadcasting Companies,* 458 F.Supp. 65, 70 (S.D.N.Y.1978) (fair use generally sustained if defendant's use not in competition with the copyrighted use). Under this principle, defendant's use is more likely to be considered fair if it serves a different function than plaintiff's.

It hardly needs stating that Reverend Falwell did not employ the ad parody for the same, intrinsic purpose as plaintiff. Hustler's use of the work was satirical. It was obviously written to entertain the magazine's readers, who would not be easily shocked by the language it contained. For defendants the article served an entirely different function. The Old Time Gospel Hour and the Moral Majority do not compete in the marketplace of ideas with Hustler magazine. In distributing the parody Falwell evidently meant to provoke the anger of his followers and to comment on the level of obscenity in the work. Avid members of the Moral Majority presumably would not rate the entertainment value of this article very highly.

The court discerns additional support for Falwell's position in the legislative history to section 107. The House Report states: "When a copyrighted work contains unfair, inaccurate, or derogatory information concerning an individual or institution, the individual or institution may copy and reproduce such parts of the work as are necessary to permit understandable comment on the statements made in the work." House Report, *supra,* at 73, U.S.Code Cong. & Admin.News 1976, p. 5687. It would thus be consistent with congressional intent to find that Falwell was entitled to provide his followers with copies of the parody in order effectively to give his views of the derogatory statements it contained.[2]

---

Rather, it should be regarded in the same light as "non-commercial uses," requiring plaintiff to show by a "preponderance of the evidence ... *some* meaningful likelihood of future harm" or present harm to the value of the copyrighted work. *See Sony Corp.,* 104 S.Ct. at 793. Thus the inquiry in these cases should focus on the fourth factor in the section 107 analysis—the effect on the value of the copyrighted work.

**2.** Hustler argues on several grounds that this section of the legislative history cannot be relied on by defendants, but the court is unpersuaded by these arguments.

Plaintiff contends that the House Report cannot be regarded as definitive authority on a fair use question inasmuch as fair use is a creature of common law and the report explicitly states that, "Section 107 is intended to restate the present doctrine of fair use, not to change, narrow or enlarge it in any way." *Id.* at 66, U.S. Code Cong. & Admin.News 1976, p. 5680. Since defendants have not cited any judicial precedent precisely on point, plaintiff says, this bit of legislative history cannot offer them any solace. This argument, however, ignores the flexible character of the doctrine of fair use. As the committee report elsewhere acknowledges, "since the doctrine is an equitable rule of reason

... each case raising the question must be decided on its own facts." *Id.* at 65, U.S.Code Cong. & Admin.News 1976, p. 5679. Thus the absence of precedent would not bar the court from deciding that a particular use was fair so long as the general factors set forth in the statute had been applied faithfully. Moreover, the court believes that the passage in question is consistent with fair use case law and, without overstating the importance of that passage to this decision, would not lightly disregard an expression of congressional intent.

Hustler next maintains that this section is of no help to defendants since the ad parody did not contain any "information about" Falwell. Plaintiff bases this assertion on the jury's special verdict in the Virginia action to the effect that the satire could not reasonably be understood as describing actual facts about Falwell. In the court's view plaintiff takes an overly literalistic approach to this passage. It defies common sense to say that a parody entitled, "Jerry Falwell talks about his first time," is not about Falwell because it was intended solely as a joke. The piece satirized Falwell's personal mores and political sincerity and contained an abundance of statements about him that were derogatory, to say the least.

■ First amendment considerations also enter into the court's assessment of the purpose and character of defendants' use. Although the first amendment does not provide a defense to copyright infringement, when an act of copying occurs in the course of a political, social or moral debate, the public interest in free expression is one factor favoring a finding of fair use. *See Keep Thomson Governor Committee v. Citizens for Gallen Committee,* 457 F.Supp. 957, 959–60 (D.N.H.1978) (political committee's use of a portion of rival candidate's musical composition amounted to fair use in light of public interest in full debate over election and absence of injury to plaintiff). *Cf. Robert Stigwood Group Limited v. O'Reilly,* 346 F.Supp. 376, 383–84 (D.Conn.1972), (priests' unauthorized copying of rock opera, "Jesus Christ Superstar," was not fair use where facts did not support defendants' contention that their performance was counterattack to original's "perverted" version of the Gospel), *rev'd on other grounds,* 530 F.2d 1096 (2d Cir.), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976).

In this case both the copyrighted work and the alleged acts of infringement involved appeals to particular moral and social viewpoints. The parody and Falwell's response were not an isolated exchange but part of a much broader, continuing debate over pornography and other social issues. Indeed, the "publisher's statement" by Larry Flynt in the November, 1983 issue protested purported attempts by conservative groups, including the Moral Majority, to censor the magazine for its unorthodox political views. Flynt wrote in part: "The First Amendment and the Bill of Rights belong to me and the people who read HUSTLER as much as they belong to Reaganites and the Falwellians of the world and their Moral Majority." The court believes that, in view of the context in which the parody appeared, the public interest in free expression would be served by facilitating an effective response by Falwell.

### 2. The nature of the copyrighted work.

■ The second factor to be weighed under section 107 is the nature of the copyrighted work. The inquiry here concerns whether plaintiff's work is primarily creative as opposed to informational; the defense of fair use has been given a greater reach when the work copied is informational in nature. *Marcus,* 695 F.2d at 1176 (citing *Universal City,* 659 F.2d at 972); *see Sony Corp.,* 104 S.Ct. at 795 n. 40 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture.") Beyond this the court should not look at the contents of the copyrighted work.

> There is nothing in the Copyright Act to suggest that the courts are to pass upon the truth or falsity, the soundness or unsoundness, of the views embodied in a copyrighted work. The gravity and immensity of the problems, theological, philosophical, economic and scientific, that would confront a court if this view were adopted are staggering to contemplate.

*Belcher v. Tarbox,* 486 F.2d 1087, 1088 (9th Cir.1973).

Plaintiff also argues that Falwell reproduced a greater portion of the work than was necessary to make understandable comment on it. In support of this argument plaintiff notes that the larger mailing to the rank-and-file of the Moral Majority did not actually include a copy of the parody; Falwell just described it. While plaintiff's point is well taken, the court does not believe that the other mailings exceeded the bounds of reasonableness. Much like the other contents of Hustler the ad parody must be seen to be appreciated. Falwell was entitled to reproduce it in its entirety to make his case that his "enemies" had gone too far.

Finally, plaintiff contends that even if Falwell himself had a right to copy the parody, the other defendants—the Moral Majority and the Old Time Gospel Hour—did not since the article did not even mention them. The court cannot accept plaintiff's rather narrow view of the facts. In the public eye the Reverend Falwell is linked inextricably with the two corporate defendants. He is their founder and president. Moreover, their involvement here was only as a medium for Falwell's communications with his constituents and a recipient of the donations he generated.

Hustler argues that its ad parody is creative in nature and is, therefore, entitled to greater protection under the fair use analysis. *New York Times Co. v. Roxbury Data Interface, Inc.,* 434 F.Supp. 217, 221 (D.N.J.1977). While the court does not dispute this characterization of Hustler's work, it cannot accept plaintiff's conclusion. Falwell did not borrow the parody for its creative worth. Defendants copied it in order to criticize its contents and protest its publication. Whatever value the article had for defendants was purely communicative and informational in character. For these reasons the inventive and creative nature of Hustler's work is not very significant here.

### 3. *The amount and substantiality of the portion used.*

The third factor for the court's consideration is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. The court must weigh the significance of the copying both in terms of the quantity and quality of the alleged infringement; it must consider how much of the copyrighted work was taken, and whether that portion was an essential element of the plaintiff's work. *See Marcus,* 695 F.2d at 1176; 3 M. Nimmer, *supra,* § 13.05[A], at 13–75. Although reproduction of a copyrighted work in its entirety ordinarily militates against a finding of fair use, *Sony Corp.,* 104 S.Ct. at 792–93, this fact alone is not dispositive. The court should evaluate an act of wholesale copying in light of the nature of the work and the potential for actual harm to plaintiff. *Id.*[3]

At the outset it would not appear that defendants copied the entire "work," as that term is used in section 107, by reproducing the ad parody. The article in question represented but one page from plaintiff's magazine bearing a single copyright registration. Although each component of a composite work, such as a periodical, is capable of individual copyright protection and need not bear a separate copyright notice, 17 U.S.C. § 404, *Lin-Brook Builders Hardware v. Gertler,* 352 F.2d 298, 301 (9th Cir.1965), this does not mean that every item in a magazine must be treated as an "entire work" whenever a court assesses the substantiality of copying under section 107(3). If this were the case, then regardless of how little defendant reproduced, he would usually have taken one hundred percent of plaintiff's work.

In the case of a periodical the court should consider the amount of the copying in light of the extent of the overall criticism or review of the periodical and the relationship of the copied portion to the periodical as a whole. In *Triangle Publications,* plaintiff claimed copyright infringement based on defendant's unauthorized reproduction of a cover of *TV Guide* in an advertisement for a competing publication. The court found fair use and its comments about the substantiality of the copying are instructive:

> We find unpersuasive Triangle's argument that the cover of TV Guide is *separately* copyrighted and that therefore Knight-Ridder has reproduced an entire copyrighted work. In our view, the cover of a magazine is entitled to copyright protection as part of the magazine, just as a paragraph in a book may be entitled to copyright protection as part of the book. Thus use of the cover of a copyrighted magazine is an infringement. However, it makes no sense to us to say that the use of a cover constitutes the use of "an entire copyrighted work." As a matter of logic and common sense, Knight-Ridder's conduct would have been far more serious had it reproduced

---

**3.** Hustler argues that reproduction of an entire work, which it asserts occurred here, can never be fair use and relies on Ninth Circuit authorities to that effect. *E.g., Marcus,* 695 F.2d at 1176 ("wholesale copying of copyrighted material precludes application of the fair use doctrine"); *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 756 (9th Cir.1978), *cert. denied sub nom. O'Neill v. Walt Disney Productions,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979) ("copying that is virtually complete or almost verbatim" could not qualify for fair use defense). In light of the Supreme Court's decision in *Sony Corp.,* however, which found fair use despite wholesale reproduction of a copyrighted work, the Ninth Circuit's position on this issue is clearly no longer controlling. *See Sony Corp.,* 104 S.Ct. at 792–3.

entire articles from TV Guide or full pages of TV schedules.

626 F.2d at 1177 n. 15 (emphasis in original).

■ Under these standards Falwell's alleged acts of infringement become insubstantial. A fair reading of the evidence shows that Falwell was criticizing a good deal more than just the ad parody when he sent out copies of it to his followers. He was attacking Hustler magazine and similar publications in general. For instance, the Moral Majority major-donor letter read in part:

In this same issue of *Hustler*, Flynt crudely demeaned Pope John Paul II and the dear people of Japan. The month before, he shamefully insulted President Reagan and myself in an unspeakably vulgar manner—by using a cartoon and pseudo-names while portraying us visiting a house of prostitution doing unbelievably immoral things.

. . . .

Sane and moral Americans all across our nation are outraged by how much these pornographers are getting away with these days. And pornography is no longer a thing restricted to back-alley bookshops and sordid movie houses.

No, pornography has thrust its ugly head into our everyday lives and is multiplying like a filthy plague. Flynt's magazine, for example, advertises pornographic telephone services where, for a fee, men or women will engage in an "obscene phone call" with you!

... Cable pornography with its "X" rated and triple "X" rated films can bleed over into a regular cable system right into your own living room.

... Entire organizations have sprung up whose sole purpose is to promote deviant sexual practices. The motto of the National Association for Man-Boy Love is "Sex before eight or else it's too late"!

And there, in my opinion, is clear proof that the billion dollar sex industry, of which Larry Flynt is a self-declared leader, is preying on innocent, impressionable children to feed the lusts of depraved adults.

For those porno peddlers, it appears that lust and greed have replaced decency and morality.

*And now Larry Flynt has been bold enough to print shocking and disgusting statements and pictures against my mother and me* —as well as against President and Mrs. Reagan, Pope John Paul II, and the Chief Justice of the United States.

Letter from Jerry Falwell to Moral Majority's major donors (emphasis in original). Thus, even assuming that the ad parody could be viewed qualitatively as an important part of the magazine's overall contents, the very broad scope of Falwell's criticism requires the court to conclude that he did not copy a substantial part of plaintiff's work by reproducing this one page. In short, Falwell's copying of the parody in its entirety does not preclude a finding of fair use.[4]

*4. The economic effect of the use.*

The fourth factor specified in section 107 is the effect of the use upon the market for or value of the copyrighted work. The Supreme Court's discussion of the fair use doctrine in *Sony Corp.* makes it plain that this factor is frequently the decisive one in light of the design of the copyright laws:

The purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. *But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create.* The prohibition of such noncommercial uses would merely inhibit access to ideas without any countervailing benefit.

---

4. Even if the ad parody could be seen as an "entire work" by itself, the court's ultimate conclusion would be unchanged. The only original element of the parody, the text, consists of approximately 300 words. In the case of such a short work the court believes that the substantiality of the copying should not be given great weight in determining fair use.

104 S.Ct. at 793 (emphasis supplied). The court went on to note:

> In certain situations, the copyright owner suffers no substantial harm from the use of the work .... Here again, is the partial marriage between the doctrine of fair use and the legal maxim *de minimis non curat lex.*

*Id.*, n. 34 (quoting Latman, Fair Use of Copyrighted Works (1958), *reprinted as* Study No. 14 in Senate Judiciary Committee, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights, 86th Cong., 2d Sess. 30 (1960)). Even before *Sony Corp.*, lower courts agreed that the effect on the value of the copyrighted work normally stands out as the most important criterion. *See, e.g., Marcus*, 695 F.2d at 1177; *Triangle Publications*, 626 F.2d at 1177; *Italian Book Corp.*, 458 F.Supp. at 69.

 The potential for harm to a copyrighted work arises if the defendant's use would tend to diminish the sales of the plaintiff's work, interfere with its marketability or fulfill the demand for the original. *See Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F.Supp. 1156, 1169 (W.D.N.Y.1982). In this case it is readily apparent that the impact of defendant's use on the plaintiff's work (be it the ad parody itself or the entire magazine) is nil. To begin with, the November, 1983, issue of Hustler, first published September 27, was long off the newsstands by the time the first set of Moral Majority mailings went out. Therefore, Falwell's reproduction could not have interfered at all with the initial sales of this issue. Further, any effect it might have on the marketability of back issues would be *de minimis* in that this was only one page of a publication which the court believes would be purchased, if at all, for its other attractions. *Cf. Sony Corp.*, 104 S.Ct. at 795 n. 40 ("Some copyrights govern material with broad potential secondary markets. Such material may well have a broader claim to protection because of the greater potential for commercial harm.")

Hustler points to the republication of the parody in its March, 1984, issue as evidence that the item had some lasting value which may have been reduced by Falwell's copying. This argument is disingenuous at best. For one thing the membership of the Moral Majority would probably not be counted among the regular readers of Hustler. But even those who are would not logically have been deterred from buying the March, 1984, issue because of Falwell's actions. The ad parody was not sold separately from the magazine, and the court doubts that a free copy of this one page would have satisfied demand for the entire issue. If anything, the mailing would have piqued interest in issues of Hustler containing the parody. *See Geis Associates*, 293 F.Supp. at 146. Hustler has simply failed to offer a logical explanation of the connection between Falwell's use of the ad parody and any concrete injury to plaintiff's copyrighted work. *See Triangle Publications*, 626 F.2d at 1177.

In considering plaintiff's plea of injury the court also is suspicious of Hustler's motives in republishing the parody when it did. By that time Falwell had filed his tort action in Virginia and Campari's advertising agency had written a strong letter of protest to plaintiff about the unauthorized use of the Campari trademark. Under these circumstances Hustler's republication could easily be taken as malicious. It could also be construed as an attempt to create a facade of damages for the very purpose of this litigation.

Finally, Hustler points to language in *Sony Corp.* to the effect that likelihood of future harm to the value of a copyrighted work may be presumed where the defendant's use is for commercial gain. 104 S.Ct. at 793. This presumption is of little avail to plaintiff in the context of this case. The Supreme Court explicitly based its discussion of commercial uses on the premise that they are to be frowned upon because they result in an "unfair exploitation of the monopoly privilege that belongs to the owner of the copyright" and reduce the incentive to create. *Id.* The unique facts of this case make it plain that Falwell's reproduction of the ad parody should not be placed in this category of commercial

use. Falwell's use did not cause Hustler any competitive injury. He was not selling copies of the ad parody to his followers or, in any commercial sense, competing with Hustler. Nor did Falwell's use decrease the value of the parody to Hustler or take away its incentive to publish such works. In fact Hustler republished the same parody in its March, 1984 issue, indicating that if anything plaintiff thought the market for the parody had increased. Even if Falwell's actions were commercially motivated, for the reasons above the court cannot see that Hustler suffered any injury.

The court has carefully considered all the evidence placed before it in light of the factors set out in section 107. It concludes that the " 'equitable rule of reason' balance," *Sony Corp.*, 104 S.Ct. at 795, tilts sharply in favor of a finding of fair use. Any other result would mean applying the copyright laws in an inflexible manner and ignoring fundamental considerations of fairness. The ad parody was a satire about Falwell. He was entitled to use it as he did.

Accordingly, IT IS HEREBY ORDERED that summary judgment be entered for defendants and that all requests for sanctions be denied.